**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company, | ) ) ) |
| Plaintiffs, | ) |
| v. | ) Case No. |
| | ) |
| ENS Medical, P.C., | ) **PLAINTIFFS DEMAND** |
| Atlantic Medical Care, P.C., | ) **TRIAL BY JURY** |
| Northern Medical Care, P.C., | ) |
| Queens Medical Diagnostic P.C., | ) |
| East Coast Medical Care, P.C., | ) |
| Garden Medical Care, P.C., | ) |
| Town Medical Care, P.C., | ) |
| Terrace Medical Care P.C., | ) |
| Go Medical, P.C., | ) |
| Omar Ahmed, M.D., | ) |
| Yong Chi, M.D., | ) |
| Delys Eva St. Hill, M.D., and | ) |
| Phyllis Gelb, M.D., | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

State Farm Mutual Automobile Insurance Company ("State Farm Mutual") and State Farm Fire and Casualty Company ("State Farm Fire") (collectively, the "State Farm Companies"), as and for their complaint against ENS Medical, P.C. ("ENS Medical"), Atlantic Medical Care, P.C. ("Atlantic Medical"), Northern Medical Care, P.C. ("Northern Medical"), Queens Medical Diagnostic P.C. ("Queens Medical"), Terrace Medical Care P.C. ("Terrace Medical"), East Coast Medical Care, P.C. ("East Coast Medical"), Garden Medical Care, P.C. ("Garden Medical"), Town Medical Care, P.C. ("Town Medical"), Go Medical, P.C. ("Go Medical"), Omar Ahmed, M.D. ("Dr. Ahmed"), Yong Chi, M.D. ("Dr. Chi"), Delys Eva St. Hill,

M.D. ("Dr. St. Hill"), and Phyllis Gelb, M.D. a/k/a Phyllis Gelb-Seidler ("Dr. Gelb") (collectively, "Defendants"), allege as follows:

## I.   NATURE OF THE ACTION

1.    This action seeks to recover money fraudulently obtained from the State Farm Companies through the submission of bills and supporting documentation that were fraudulent for neurological examinations, nerve conduction velocity tests ("NCVs"), and electromyography tests ("EMGs") (NCVs and EMGs are collectively referred to herein as electrodiagnostic tests ("EDX Tests")) purportedly performed by ENS Medical, Atlantic Medical, Northern Medical, Queens Medical, and Terrace Medical, and examinations and extracorporeal shock wave therapy treatment ("Shockwave Therapy") purportedly performed by East Coast Medical, Garden Medical, Town Medical, and Go Medical, on individuals ("patients") who were involved in motor vehicle accidents and eligible for No-Fault benefits under State Farm Mutual or State Farm Fire insurance policies ("No-Fault Benefits").

2.    Defendants are:

(a)    ENS Medical, Atlantic Medical, Northern Medical, Queens Medical, and Terrace Medical (collectively, the "EDX Providers") and their purported owner Dr. Ahmed, who purport to perform and bill for medically unnecessary neurological examinations and EDX Tests;

(b)    Dr. Chi and Dr. St. Hill who, together with Dr. Ahmed and others (collectively, the "Rendering EDX Providers"), purport to perform medically unnecessary neurological examinations and EDX Tests that were billed by the EDX Providers;

(c)    East Coast Medical, Garden Medical, Town Medical, and Go Medical (collectively, the "Shockwave Therapy Providers") and their owner, Dr. Ahmed, who purport to perform and bill for medically unnecessary examinations and Shockwave Therapy; and

(d)    Dr. Gelb who, together with Dr. Ahmed and others, including Richard Fofie, P.A. (collectively, the "Rendering Shockwave Therapy Providers"), purport to perform medically unnecessary examinations and Shockwave Therapy that were billed by the Shockwave Therapy Providers.

2

3.      Defendants' scheme involves patients who are in motor vehicle accidents and are treated at multidisciplinary facilities throughout the New York metropolitan area (the "Clinics"). ENS Medical, Atlantic Medical, Northern Medical, and Terrace Medical are transient providers of neurological examinations and EDX Tests.  East Coast Medical, Garden Medical, Town Medical, and Go Medical are transient providers of examinations and Shockwave Therapy. Rendering EDX Providers and Rendering Shockwave Therapy Providers associating with and working for these EDX Providers and Shockwave Therapy Providers move from location to location delivering these services based upon where the EDX Providers and Shockwave Therapy Providers have access to patients.  Queens Medical has operated out of multiple Clinics, providing neurological examinations and EDX Tests, among other services.

4.      The scheme requires patients upon whom examinations and EDX Tests and Shockwave Therapy can be performed.  Medical doctors and other health care professionals, including Metro Pain Specialists, P.C. (which is owned by Leonid Shapiro, M.D. ("Dr. Shapiro")) Smart Choice Medical, P.C. ("Smart Choice Medical") (which is owned by Rolando Chumaceiro, M.D. ("Dr. Chumaceiro")), and Jean-Pierre Barakat, M.D. ("Dr. Barakat") (collectively, the "Referring Providers"), and/or others who control the Clinics where patients are treated, fulfill this role by referring patients to or arranging for their patients to be treated by the EDX Providers and the Shockwave Therapy Providers.   These Referring Providers and individuals who control the Clinics where patients are treated do not refer patients for examinations, EDX Tests, and/or Shockwave Therapy because such services are necessary. Rather, they steer patients to the EDX Providers and the Shockwave Therapy Providers pursuant to financial arrangements between Dr. Ahmed, the EDX Providers, and Shockwave Therapy Providers on the one hand and the Referring Providers and/or others who control the Clinics

where patients are treated on the other hand.  Such arrangements are sometimes disguised as rent payments, sometimes documented with purported leases or licenses for the use of space, but, in reality, these arrangements are made in exchange for referrals and to gain access to patients, which violate laws prohibiting kickbacks.

5.     Patients referred to the EDX Providers undergo a neurological examination performed by one of the Rendering EDX Providers.  The EDX Providers and the Rendering EDX Providers purport to legitimately examine patients to determine the nature and extent of their neurological complaints and conditions.  In fact, the EDX Providers and the Rendering EDX Providers fail to legitimately examine patients to determine the true nature and extent of their injuries, but rather report complaints, examination findings, and diagnoses to justify EDX Tests.  Based on these complaints, findings, and diagnoses, the EDX Providers and the Rendering EDX Providers recommend that patients undergo EDX Tests.

6.     The EDX Providers and the Rendering EDX Providers then purport to perform, and the EDX Providers bill for, medically unnecessary EDX Tests.  *See* Ex. 1.  These EDX Tests are not tailored to the individual needs of any patient and yield results that are not credible.

7.     Patients referred to the Shockwave Therapy Providers purportedly undergo an examination performed by one of the Rendering Shockwave Therapy Providers.  The Shockwave Therapy Providers and the Rendering Shockwave Therapy Providers purport to legitimately examine patients to determine the nature and extent of their complaints and conditions.  In fact, the Shockwave Therapy Providers and the Rendering Shockwave Therapy Providers fail to legitimately examine patients to determine the true nature and extent of their injuries, but rather report complaints, examination findings, and diagnoses to justify the use of Shockwave Therapy.

4

Based on these complaints, findings, and diagnoses, the Shockwave Therapy Providers and the Rendering Shockwave Therapy Providers recommend that patients undergo Shockwave Therapy.

8.      The Shockwave Therapy Providers and the Rendering Shockwave Therapy Providers then purport to perform, and the Shockwave Therapy Providers bill for, medically unnecessary Shockwave Therapy.  *See* Ex. 2.  The Shockwave Therapy Providers and the Rendering Shockwave Therapy Providers perform Shockwave Therapy often on two or more areas of the body per session and over multiple dates of service.  The Shockwave Therapy is not tailored to the individual needs of any patient.  Among other things, the Shockwave Therapy generally is incapable of treating the conditions for which it is purportedly provided, is performed improperly, and is billed using a code that misrepresents the nature of the service being delivered.

9.      Ultimately, Dr. Ahmed is an opportunist more interested in profiting from his patients than in their well-being.  Over time, he has changed the services he delivers not because he wants to improve his patients' conditions, but because he sees an opportunity to bill.  In each instance, as he moves from service to service, he is without the skills or expertise to perform these procedures properly or to use them for the conditions for which they are intended.  Thus, from April 2017 to the present, the EDX Providers, which Dr. Ahmed owns, have provided medically unnecessary EDX Tests, and from October 2020 to the present, the Shockwave Therapy Providers, which Dr. Ahmed owns, have provided unnecessary Shockwave Therapy. From approximately October 2019 to the present Dr. Ahmed also performed medically unnecessary vestibular testing, including videonystagmography ("VNG") testing, and Trans-Cranial Doppler ("TCD") testing.

10.     As a result of the scheme and the above-described conduct:  (a) patients are not legitimately examined, tested, and diagnosed for conditions they may have; (b) patients are subjected to examinations, tests, and treatment for conditions they may not have; and (c) patients' limited No-Fault Benefits are substantially reduced and therefore not available for legitimate treatment they may need.

11.     The EDX component of Defendants' scheme began as early as April 2017 and continues uninterrupted through the present time.  The Shockwave Therapy component of Defendants' scheme began as early as October 2020 and continues uninterrupted through the present time.  As a result of the scheme, the State Farm Companies have incurred damages of more than $1.3 million.

## II.     JURISDICTION AND VENUE

12.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under 18 U.S.C. § 1961 *et seq.* ("RICO") because they arise under the laws of the United States of America.  Pursuant to 28 U.S.C. § 1367, this Court also has supplemental jurisdiction over the state-law and declaratory-judgment claims because they are so related to the RICO claims as to form part of the same case or controversy.  Pursuant to 28 U.S.C. § 1332(a)(1), this Court also has jurisdiction over the state-law and declaratory-judgment claims because the matter in controversy exceeds the sum or value of $75,000, exclusive or interest or costs, and is between citizens of different states.  Defendants are jointly and severally liable for the damages caused to the State Farm Companies.

13.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in this district because a substantial part of the events or omissions giving rise to the claims occurred here.

6

## III.    PARTIES

### A.    Plaintiffs

14.    State Farm Mutual is a corporation organized under the laws of Illinois with its principal place of business in Illinois, and issues automobile insurance policies in New York.

15.    State Farm Fire is a corporation organized under the laws of Illinois with its principal place of business in Illinois, and issues automobile insurance policies in New York.

### B.    Defendants

#### 1.    The EDX Providers

16.    ENS Medical is a domestic professional corporation organized under the laws of New York with its principal place of business in New York.  It was incorporated on or about April 21, 2017.  ENS Medical is a transient provider that employs and/or independently contracts with physicians to provide neurological examinations and EDX Tests at multiple locations throughout the New York City area, including, but not limited to:  105-10 Flatlands Avenue, Brooklyn, New York ("105-10 Flatlands"); 14 Bruckner Boulevard, Bronx, New York ("14 Bruckner Boulevard"); 204-12 Hillside Avenue, Jamaica, New York ("204-12 Hillside"); 3060 East Tremont Avenue, Bronx, New York ("3060 East Tremont"); 33-06 88th Street, Jackson Heights, New York ("33-06 88th"); 4014 Boston Road, Bronx, New York ("4014 Boston Road"); 409 Rockaway Avenue, Brooklyn, New York ("409 Rockaway"); 79-45 Metropolitan Avenue, Flushing, New York ("79-45 Metropolitan Avenue"); and 1975 Linden Boulevard, Elmont, New York.  On March 25, 2022, GEICO filed a federal lawsuit against ENS Medical, Atlantic Medical, Dr. Ahmed, and others alleging, among other things, that ENS Medical and Atlantic Medical performed and submitted bills for medically unnecessary examinations and EDX Tests, including that the EDX Tests performed by ENS Medical and Atlantic Medical were performed in a cookie-cutter fashion, resulted in impossible findings and improper diagnoses of

radiculopathy, and failed to comment on potentially serious conditions.  *See GEICO, et al. v. Ahmed, et al.*, 1:22-cv-01679-ENV-SJB (E.D.N.Y.).  ENS Medical is, and has been since its incorporation, purportedly owned by Dr. Ahmed.

17.    Atlantic Medical is a domestic professional corporation organized under the laws of New York with its principal place of business in New York.  It was incorporated on or about April 17, 2017.  Atlantic Medical is a transient medical provider that employs and/or independently contracts with physicians to provide neurological examinations and EDX Tests at multiple locations throughout the New York City area, including, but not limited to:  409 Rockaway; 204-12 Hillside; 90-16 Sutphin Boulevard, Jamaica, New York ("90-16 Sutphin"); 105-10 Flatlands; 2426 Eastchester Road, Bronx, New York; 33-06 88th; 332 East 149th Street, Bronx, New York ("332 East 149th Street"); and 4014 Boston Road.  Atlantic Medical is, and has been since its incorporation, purportedly owned by Dr. Ahmed.

18.    Northern Medical is a domestic professional corporation organized under the laws of New York with its principal place of business in New York.  It was incorporated on or about August 6, 2014, by Madhu Babu Boppana, M.D. ("Dr. Boppana").  Dr. Boppana purportedly transferred ownership of Northern Medical to Dr. Ahmed and has worked for Northern Medical as a Rendering EDX Provider.  From approximately October 2014 to February 2017, Northern Medical provided a range of medical services, including neurological examinations and EDX Tests, exclusively at 105-20 Northern Boulevard, Flushing, New York ("105-20 Northern").  Since at least July 2017, Northern Medical has employed and/or independently contracted with doctors to provide neurological examinations and EDX Tests at multiple locations throughout the New York City area, including, but not limited to:  102-55 63rd Road, Flushing, New York; 105-10 Flatlands; 1767 Southern Boulevard, Bronx, New York ("1767 Southern"); 204-12 Hillside;

33-06 88th; 384 East 149th Street, Bronx, New York; 409 Rockaway; 87-15 115th Street, Jamaica, New York; and 1100 Pelham Parkway S, Bronx, New York.  In February 2020, Northern Medical billed for TCD testing, and in February 2021, Northern Medical billed for vestibular testing, including VNG testing.  On March 5, 2020, GEICO filed a federal lawsuit against Northern Medical, Dr. Ahmed, Dr. Boppana, and others alleging that the services provided at 105-20 Northern were medically unnecessary and were performed pursuant to illegal referral arrangements.  *See GEICO v. N. Med. Care, P.C.*, 1:20-cv-01214-RRM-SMG (E.D.N.Y.).  GEICO alleged, among other things, that Dr. Ahmed paid kickbacks for patient referrals through the bank account of his company, Queens Corona Medical, P.C., which does not appear to have provided any medical services.  Kickbacks were allegedly paid to companies with no legitimate business operations, including to a purported network services company, a purported professional administrative services company, and a purported computer and network services company.  GEICO also alleges Dr. Boppana paid kickbacks for patient referrals: (1) through the bank account of his company, Science and Art, Inc., to several companies with no legitimate business operations, including to a purported human resources company, a purported medical supply company, and a purported cleaning company, and (2) through a bank account of another company he owns, Queens Wellness Medical, P.C., to a purported marketing company.  Dr. Ahmed's entity, Queens Corona Medical, P.C., was also a named defendant in a federal civil forfeiture action based on its involvement in money laundering and/or money laundering conspiracy, along with numerous other New York medical entities and providers that purportedly render health care goods and services to No-Fault patients.  *See United States v. Approximately $32,882.44 from Queens Corona Med., P.C., Citibank Account Ending in 7155*, 4:16-cv-00877 (E.D. Mo. June 17, 2016).

19.     Northern Medical may facilitate the payment of kickbacks by using cash to funnel money to individuals who can supply patients or other goods or services to it.  At least six medical-reimbursement checks issued in 2018 by the State Farm Entities to Northern Medical for nearly $24,000 were converted to cash at a check-cashing company called Cambridge Clarendon Financial Service, LLC ("Cambridge Check Cashing"), in Clifton, New Jersey.  In the GEICO lawsuit, GEICO similarly discovered that medical-reimbursement checks written by GEICO payable to Northern Medical were converted to cash at check-cashing companies.  On June 27, 2013, over a year before Northern Medical was incorporated, two documents were submitted to Cambridge Check Cashing.  One, an "Application for Commercial Check Cashing Account," identified "Howard Greenleaf" as Northern Medical's president.  A second, a "Resolution Granting Authority to Cash Company Checks," named "Sam Timmat," "Neil Laster," "Mary Recaro," and "Howard Greenleaf" as authorized to negotiate Northern Medical checks at Cambridge Check Cashing.  Neither document referenced Dr. Boppana or Dr. Ahmed, the purported owners.  The listed names may have been fictitious and a different person actually cashed Northern Medical checks at Cambridge Check Cashing.  The owner of Cambridge Check Cashing, Jerome Reed, signed a declaration that at least 25 Northern Medical checks were cashed by Alla Kuratova. Dr.  Ahmed has denied knowing Kuratova.  Kuratova was previously indicted in New York for participating in a prescription drug trafficking ring involving over $3.4 million in oxycodone and other prescription drugs distributed through medical offices she and others controlled in Brooklyn.  Kuratova allegedly recruited individuals to act as phony patients as part of the scheme.

20.     Terrace Medical is a domestic professional corporation organized under the laws of New York with its principal place of business in New York.  It was incorporated on or about

April 16, 2021.   Terrace Medical is a transient medical provider that employs and/or independently contracts with physicians to provide neurological examinations and EDX Tests at multiple locations throughout the New York City area, including, but not limited to: 89-25 130th Street, Richmond Hill, New York 11418 ("89-25 130th Street"); 2534 Westchester Avenue, 2422 Knapp Street, Brooklyn, New York 11235 ("2422 Knapp Street"); 79-45 Metropolitan Avenue, 90-46 Corona Avenue, Queens, New York 11373 ("90-46 Corona Avenue"); 430 West Merrick Road, Valley Stream, New York 11580; 4009 Church Avenue, Brooklyn, New York 11203; 4014 Boston Road; 60-40 82nd Street, Middle Village, New York 11379 ("60-40 82nd Street"); 788 Southern Boulevard, Bronx, New York 10455, and 409 Rockaway Avenue. Terrace Medical is, and has been since its incorporation, purportedly owned by Dr. Ahmed.

21.    Queens Medical is a domestic professional corporation organized under the laws of New York with its principal place of business in New York.  It was incorporated on or about July 7, 2016.  Queens Medical has operated at multiple locations in the New York metropolitan area, including 214-29 Jamaica Avenue, New York ("214-29 Jamaica") and 221-05 Jamaica Avenue, New York ("221-05 Jamaica").  Dr. Ahmed has testified that Queens Medical also has performed services at 488 Lafayette Avenue, Brooklyn, New York ("488 Lafayette"), 560 Prospect Avenue, Bronx, New York ("560 Prospect"), 607 Westchester Avenue, Bronx, New York, 3703 92nd Street, Jackson Heights, New York, 11 East Hawthorne Avenue, Valley Stream, New York, 21 Washington Avenue, Brentwood, New York, 102-34 Atlantic Avenue, Ozone Park, New York, 9413 Flatlands Avenue, Brooklyn, New York, and 1530 Bedford Avenue, Brooklyn, New York.  Its services have included not only neurological examinations and EDX Tests, but also physical therapy and chiropractic treatment, initial medical examinations, and other diagnostic tests.  Since approximately October 2019, Queens Medical

has also billed for TCD testing and vestibular testing, including VNG testing. Dr. Ahmed purports to perform many of the neurological examinations and EDX Tests that Queens Medical renders. Queens Medical is, and has been since its incorporation, purportedly owned by Dr. Ahmed.

22. Also located at 214-29 Jamaica during the period Queens Medical operated at that address were two medical billing companies owned and/or operated by Svetlana Kay Kovaleva a/k/a Melana Kay ("Svetlana Kay"): Medical Evaluation Services and Billing, Inc. and Med Consulting and Management Inc. On March 19, 2018, Svetlana Kay formed a property holding company, KC Queens Properties LLC ("KC Queens Properties") with a business address of 214-29 Jamaica. On or about July 3, 2018, Svetlana Kay's holding company, KC Queens Properties, purchased the building at 221-05 Jamaica, and after building renovations were completed in early 2019, 221-05 Jamaica opened as a medical clinic with the name "Queensboro Medical Group" emblazoned on its awning. At that time, Queens Medical and other providers who had previously treated patients at 214-29 Jamaica, began treating patients at 221-05 Jamaica. Dr. Ahmed has testified that Svetlana Kay is also on Queens Medical's payroll as an employee who does its billing, handles the scheduling of Queens Medical's medical professionals and technicians at the locations where Queens Medical performs services, assists in the submission of collections and arbitration paperwork, and supervises the dictation of examination forms and their filing. On March 25, 2022, GEICO filed a federal lawsuit against Queens Medical, Dr. Ahmed, and others alleging, among other things, that Queens Medical performed and billed for medically unnecessary examinations, EDX Tests, and VNG and TCD tests. *See GEICO, et al. v. Ahmed, et al.*, 1:22-cv-01679-ENV-SJB (E.D.N.Y.).

### 2.   The Shockwave Therapy Providers

23.    East Coast Medical is a domestic professional corporation organized under the laws of New York with its principal place of business in New York.  It was incorporated on or about January 3, 2020.  East Coast Medical is a transient medical provider that employs and/or independently contracts with physician assistants, nurse practitioners, and/or technicians to provide examinations and Shockwave Therapy at multiple locations throughout the New York City area, including, but not limited to: 14 Bruckner Boulevard, where Dr. Ahmed has testified he pays rent to Liberty Rhea, a physical therapist; 332 East 149th Street, where Dr. Ahmed has testified he pays rent to Glenn Whitney, D.C.; 4014 Boston Road, where  Dr. Ahmed has testified he pays rent to Dr. Barakat, M.D.; 3432 East Tremont Avenue, Bronx, New York 10465, where Dr. Ahmed has testified he pays rent to Joseph Raia, M.D.; 3060 East Tremont, where Dr. Ahmed has testified he pays rent to Robert Rook, D.C.; 60-40 82nd Street, where Dr. Ahmed has testified he pays rent to Peter Albis, D.C.; 90-16 Sutphin Boulevard, which Dr. Ahmed has testified is "a Metro Pain Specialists location"; 89-25 130th Street, where Dr. Ahmed has testified he pays rent to Dr. Raia; 62-69 99th Street, Flushing, New York 11374, where Dr. Ahmed has testified he pays rent to Dr. Whitney; and 2184 Flatbush Avenue, Brooklyn, New York 11234, where Dr. Ahmed has testified he pays rent to Diana Vavikova, D.C.  East Coast Medical performed Shockwave Therapy on patients from at least October 2020 through the present.  On March 25, 2022, GEICO filed a federal lawsuit against East Coast Medical, Garden Medical, Town Medical, Dr. Ahmed, and others alleging, among other things, that East Coast Medical, Garden Medical, and Town Medical performed and billed for medically unnecessary examinations and Shockwave Therapy.  *See GEICO, et al. v. Ahmed, et al.*, 1:22-cv-01679-ENV-SJB (E.D.N.Y.).  East Coast Medical is, and has been since its incorporation, purportedly owned by Dr. Ahmed.

13

24.     Garden Medical is a domestic professional corporation organized under the laws of New York with its principal place of business in New York.  It was incorporated on or about April 12, 2021.  Garden Medical is a transient medical provider that employs and/or independently contracts with physician assistants, nurse practitioners, and/or technicians to provide examinations and Shockwave Therapy at multiple locations throughout the New York City area, including, but not limited to 21 Washington Avenue, where Dr. Ahmed testified he had a lease agreement with Hector Melgar, P.T.; 535 Broadhollow Road, Melville, New York 11747 and 1050 Old Nichols Road, Islandia, New York 11749, where Dr. Ahmed has testified he paid rent to Thomas Dow, D.C.; 2799 Route 112, Medford, New York 11763, where Dr. Ahmed testified he had a lease agreement with Todd Goldman, D.C.; 513 Church Avenue, Brooklyn, New York 11218; 900 East Tremont Avenue, Bronx, New York 10460, where Dr. Ahmed testified he has a lease agreement with Khaled Osman, D.O.; 127 Post Avenue, Westbury, New York 11590, where Dr. Ahmed testified he has a lease agreement with Brett Saal, D.C.; 1800-A New York Avenue, Huntington Station, New York 11746, where Dr. Ahmed testified he has a lease agreement with David Tubens, D.C.; 2598 3rd Avenue, Bronx, New York 10454 and 4226A 3rd Avenue, Bronx, New York 10457, where Dr. Ahmed testified he has lease agreements with Gurvansh Anand, D.C.; 865 Cypress Avenue, Flushing, New York 11385, where Dr. Ahmed testified he had a lease agreement with Jason Brattner, D.C.  Dr. Ahmed testified on behalf of Garden Medical that both East Coast Medical and Garden Medical share the same mailing address, which is Dr. Ahmed's home address, share the same phone number, which is Dr. Ahmed's cell phone number, and share the same fax number.  He also testified that East Coast Medical and Garden Medical share the same billers, technicians, and other than the header, the same treatment forms.  Garden Medical has performed Shockwave Therapy on

patients from at least May 2021 through the present.  Garden Medical is, and has been since its incorporation, purportedly owned by Dr. Ahmed.

25.     Go Medical is a domestic professional corporation organized under the laws of New York with its principal place of business in New York.  It was incorporated on or about August 12, 2021.  Go Medical is a transient medical provider that employs and/or independently contracts with physician assistants, nurse practitioners, and/or technicians to provide examinations and Shockwave Therapy at multiple locations throughout the New York City area, including, but not limited to 441 Willis Avenue, Bronx, New York 10455 ("441 Willis Avenue"); 79-45 Metropolitan Avenue; 89-25 130th Street; 179 School Street, Westbury, New York 11590; 2354 Westchester Avenue, Bronx, New York 10462; 2422 Knapp Street; and 90-46 Corona Avenue.  Go Medical has performed Shockwave Therapy on patients from at least October 2022 through the present.  Go Medical is, and has been since its incorporation, purportedly owned by Dr. Ahmed

26.     Town Medical is a domestic professional corporation organized under the laws of New York with its principal place of business in New York.  It was incorporated on or about August 13, 2020.  Town Medical is a transient medical provider that employs and/or independently contracts with physicians, nurse practitioners, physician assistants, and/or technicians to provide examinations and Shockwave Therapy at multiple locations throughout the New York City area, including, but not limited to: 79-45 Metropolitan Avenue; 632 Utica Avenue, Brooklyn, New York 11203; 2426 Eastchester Road; 1799 Brentwood Road, Brentwood, New York 11717; 1767 Southern Boulevard; and 37 Smith Street, Freeport, New York 11520.  Town Medical performed Shockwave Therapy on patients from at least February 2021 through May 2021.

27.     While NF-3 Forms submitted to the State Farm Companies identify Dr. Gelb as the owner of Town Medical, Town Medical has in fact at all times been owned by Dr. Ahmed. Town Medical's certificate of incorporation lists Dr. Ahmed as its incorporator and as the only "individual[] . . . [who is an] original shareholder[], director[] and officer[] of" Town Medical, and uses Dr. Ahmed's home address for Town Medical's registered address.  As of the date of this filing, no document has been filed with the New York Department of State reflecting a change in ownership from Dr. Ahmed to Dr. Gelb or anyone else.  Moreover, Town Medical's documentation and operations are indistinguishable from East Coast Medical and Garden Medical, both of which are owned by Dr. Ahmed.  Town Medical, East Coast Medical, and Garden Medical have patients sign the identical "General Consent for Care and Treatment Consent" form (the "General Consent Form").  Indeed, some General Consent Forms submitted by Town Medical bear a header for "East Coast Medical Care PC" and use Dr. Ahmed's home address.  *See* Ex. 3.  Town Medical uses the same treatment forms employed by East Coast Medical and Garden Medical that were created by Dr. Ahmed.  Preprinted language in sections of the "RPW Consult Form" submitted by Town Medical, East Coast Medical, and Garden Medical is nearly identical.  Finally, Town Medical, East Coast Medical, and Garden Medical share employees and independent contractors, including Richard Fofie, P.A. ("P.A. Fofie"), who worked for all three entities.  Dr. Ahmed testified P.A. Fofie is an employee of East Coast Medical and a full-time employee of Garden Medical.

### 3.      The Rendering Providers

28.     Dr. Ahmed is a Rendering EDX Provider and a Rendering Shockwave Therapy Provider.  He resides in and is a citizen of New York.  Dr. Ahmed has been licensed to practice medicine in New York since 2006.  He has purported to own Atlantic Medical, ENS Medical, Queens Medical, Terrace Medical, East Coast Medical, Garden Medical, and Go Medical since

16

their incorporation. While NF-3 Forms submitted to the State Farm Companies by Town Medical identify Dr. Gelb as Town Medical's owner, Town Medical has in fact been owned at all times since its incorporation by Dr. Ahmed. Although Dr. Boppana incorporated Northern Medical, Dr. Ahmed has purported to own Northern Medical at all times relevant to this Complaint. Dr. Ahmed has performed medically unnecessary neurological examinations and EDX Tests on behalf of Atlantic Medical, ENS Medical, Northern Medical, Queens Medical, Terrace Medical, and other entities Dr. Ahmed owns, Boulevard Medical Care, P.C. ("Boulevard Medical"), Pegasus Medical Care, P.C. ("Pegasus Medical"), and Parkside Medical Care, P.C. ("Parkside Medical"), and medically unnecessary examinations and Shockwave Therapy on behalf of East Coast Medical, Garden Medical, and Go Medical, which were then billed to the State Farm Companies. Dr. Ahmed has also performed medically unnecessary TCD testing and vestibular testing on patients of Queens Medical, Northern Medical, and Pegasus Medical. Dr. Ahmed also purports to own Modern Brooklyn Medical, P.C. ("Modern Brooklyn"), which not only provides neurological examinations and EDX Tests, but other services at Clinics that catered to individuals who had been in automobile accidents. In August 2017, the United States Internal Revenue Service issued a federal tax lien against Dr. Ahmed for $27,181 for taxes owed from the 2015 tax year. On March 25, 2022, GEICO filed a federal lawsuit against Dr. Ahmed and others, including many of the entities he owns that are defendants in this case — ENS Medical, Atlantic Medical, Queens Medical, East Coast Medical, Garden Medical, and Town Medical. *See GEICO, et al. v. Ahmed, et al.*, 1:22-cv-01679-ENV-SJB (E.D.N.Y.). According to GEICO, Dr. Ahmed and these entities "masterminded and implemented a complex fraudulent scheme in which" they billed auto insurers for "medically unnecessary, experimental, excessive, illusory, and/or otherwise unreimbursable healthcare services." GEICO alleged Dr. Ahmed

rarely, if ever, personally performed any services on behalf of his entities and that instead independent contractors unlawfully performed services on their behalf. GEICO also alleged Dr. Ahmed and his entities rendered services at over 60 different No-Fault medical clinic locations as a result of illegal kickback and referral arrangements entered into with unlicensed laypersons and/or healthcare professionals who controlled access to the patients at these clinics.

29.     Dr. Chi is a Rendering EDX Provider. He resides in and is a citizen of New York. He has been licensed to practice medicine in New York since 2007. Dr. Chi performed medically unnecessary neurological examinations and EDX Tests on behalf of Atlantic Medical, ENS Medical, Northern Medical, Terrace Medical, Boulevard Medical, Pegasus Medical, and Parkside Medical, which were then billed to the State Farm Companies. He also has performed EDX Tests on behalf of Referring Providers Metro Pain and Smart Choice Medical, as well as Barakat Medical Care P.C. ("Barakat Medical Care"), which is owned by Dr. Barakat. Dr. Barakat referred patients for unnecessary neurological examinations and EDX Tests to the EDX Providers through his company, Bronx County Medical Care, P.C. ("Bronx County Medical"), and he has referred patients to the Shockwave Therapy Providers for medically unnecessary examinations and Shockwave Therapy. Dr. Chi has been a defendant in at least two other federal actions in which he and others are alleged to have engaged in schemes to defraud insurers through the submission of fraudulent bills for unnecessary medical services, including EDX Tests. In *GEICO, et al. v. Della Badia, et al.*, No. 1:13-cv-01720-CBA-VMS (E.D.N.Y.), and *GEICO, et al. v. Prescott, et al.*, No. 1:14-cv-00057-BMC (E.D.N.Y.), GEICO alleged two different but similar schemes in which the owners of transient medical providers paid kickbacks to clinic owners in exchange for referring patients and providing space for the transient medical providers to perform unnecessary treatment on patients, including EDX Tests. Dr. Chi was

alleged to have independently contracted with the transient medical providers to evaluate and perform EDX Tests on patients as a result of the kickbacks paid to the clinic owners.

30.     Dr. St. Hill is a Rendering EDX Provider.  She resides in and is a citizen of New York.   Dr. St. Hill has been licensed to practice medicine in New York since 1989.  She performed medically unnecessary neurological examinations and EDX Tests on behalf of Atlantic Medical, ENS Medical, and Northern Medical, as well as Dr. Ahmed's entity, Modern Brooklyn, which were then billed to the State Farm Companies.  She has also performed neurological examinations and EDX Tests on behalf of other providers, including Referring Providers Metro Pain, Smart Choice Medical, Starrett City Medical, P.C. ("Starrett City Medical"), and Hillcrest Medical Care, P.C. ("Hillcrest Medical").  Starrett City Medical and Hillcrest Medical were owned on paper by Azu Ajudua, M.D., but were later acquired by Metro Pain.  On August 25, 2016, Dr. St. Hill was found guilty by the New York Department of Health Office of Professional Medical Conduct (the "OPMC") of professional misconduct, including but not limited to performing EDX Tests on patients "with no medical justification."  The OPMC suspended Dr. St. Hill's medical license for 90 days and put her on probation for five years, which began on December 21, 2016.  Her probation included that she be required to use a practice monitor, which meant that she could only practice medicine when her practice was monitored by a physician board certified in an appropriate specialty, such as neurology or physical medicine and rehabilitation.  In concluding that Dr. St. Hill had engaged in sanctionable misconduct, the OPMC found, among other things, that there were "striking similarities between the histories and physical examinations, diagnoses, [and] ordered tests and treatments" across multiple patients, and that Dr. St. Hill "guided the manner in which these Patients would be evaluated and treated to maximize reimbursement, rather than rendering appropriate care as

19

determined by each Patient's individual and specific medical conditions and needs." The OPMC determined that Dr. St. Hill "lacked credibility, showed no remorse for her misconduct and failed to take responsibility for her actions[,]" and that she "inten[d]ed to deceive" the OPMC by falsely testifying that, among other things, the EDX Tests performed on patients were justified, when they were not. In July 2017, Dr. St. Hill began performing services for Dr. Ahmed through Northern Medical.

31.     Dr. Gelb is a Rendering Shockwave Therapy Provider. She resides in and is a citizen of New York. Dr. Gelb has been licensed to practice medicine in New York since 1996. Dr. Gelb performed medically unnecessary examinations and Shockwave Therapy on behalf of East Coast Medical and Town Medical, which were then billed to the State Farm Companies. On NF-3 forms submitted by Town Medical to the State Farm Companies, Town Medical misrepresents that Dr. Gelb is its owner. *See* Ex. 4. In fact, Dr. Gelb is not and has not ever owned Town Medical. Rather, Dr. Ahmed has at all times been Town Medical's owner. On March 25, 2022, GEICO filed a federal lawsuit against Dr. Gelb and others, including Dr. Ahmed and Town Medical, alleging, among other things, that Dr. Gelb was merely the nominal owner of Town Medical, that she rarely, if ever, personally treated any patients, and she "served to conceal Ahmed's true ownership and control of Town Medical and the provision of" fraudulent services. *See GEICO, et al. v. Ahmed, et al.*, 1:22-cv-01679-ENV-SJB (E.D.N.Y.). Dr. Gelb faces similar allegations that she is the nominal owner of another clinic providing services to No-Fault patients. In *GEICO, et al. v. Gelb, et al.*, 1:23-cv-05250-ENV-RML (E.D.N.Y.), GEICO has alleged Dr. Gelb "falsely posed as the purported owner[] of Avenue Medical Care," concealing the unlawful ownership and control of the clinic by unlicensed laypersons.

20

## IV.   ALLEGATIONS COMMON TO ALL COUNTS

### A.   The New York No-Fault Laws

#### 1.   Claims for Payments Under the No-Fault Laws

32.   The State Farm Companies underwrite automobile insurance in New York.

33.   Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law § 5101 *et seq.*) and the regulations promulgated thereto (11 N.Y.C.R.R. § 65 *et seq.*) (collectively, "the No-Fault Laws"), automobile insurers are required to provide No-Fault Benefits to insureds.

34.   No-Fault Benefits include up to $50,000 per insured for necessary expenses incurred for various health care goods and services.

35.   An insured can assign his or her right to No-Fault Benefits to the providers of health care services in exchange for those services.  Pursuant to a duly executed assignment, a health care provider may submit claims directly to insurance companies and receive payment for necessary medical services.

36.   Pursuant to § 403(e) of the New York State Insurance Law, the verification of the treatment form submitted by health care providers to the State Farm Companies and all other insurers must be signed by the health care providers subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

37.   Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or collect No-Fault Benefits if they fail to meet any applicable New York state or local licensing requirement.  The implementing regulation, 11 N.Y.C.R.R. § 65-3.16(a)(12), states in relevant part:

A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York . . . .

38.     Recognizing the fundamental importance of these laws in safeguarding the public health, safety, and welfare, the New York Legislature has made it a felony offense for anyone to circumvent these laws deliberately, as well as an act of professional misconduct for any licensed individual, professional service corporation, or professional service limited liability company to do so.  *See* N.Y. Bus. Corp. Law §§ 1503(b), 1507, 1508, 1511; N.Y. Educ. Law §§ 6507(4)(c), 6512, 6530(1), (2) & (21); 8 N.Y.C.R.R. § 29.1(b); N.Y. Penal Law § 175 *et seq.*; N.Y. Ltd. Liab. Co. Law § 1201 *et seq.*

**2.     New York Laws Regarding Patient Referrals**

39.     In New York, medical provider licenses are governed by New York Education Laws.  N.Y. Educ. Law § 6500 *et seq.*  Under New York law, it is unlawful for a physician or chiropractor to directly or indirectly offer, give, solicit, receive, or agree to receive, any fee or other consideration to or from a third party for the referral of a patient or in connection with the performance of professional services.  *See* N.Y. Educ. Law § 6530(18); *see also* 8 N.Y.C.R.R. § 29.1(b)(3).

40.     Similarly, under New York law, it is unlawful for a physician or chiropractor to exercise undue influence on a patient, including the promotion or the sale of goods or services in such a manner as to exploit the patient for the financial gain of the physician, chiropractor, or a third party.  *See* N.Y. Educ. Law § 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

41.     Under New York law, it is unlawful for a physician or chiropractor to share professional fees, including arrangements where payments are made in exchange for furnishing space, facilities, equipment, or personal services, and including any arrangement or agreement

whereby the amount received in payment for furnishing space, facilities, equipment, or personal services used is dependent upon the income or receipts of the licensee. *See* N.Y. Educ. Law § 6530(19); 8 N.Y.C.R.R. § 29.1(b)(4).

42.     Under New York law, it is unlawful for a physician or chiropractor to make a referral to a health care provider where the physician or chiropractor has a compensation arrangement with the health care provider which either exceeds fair market value or which provides compensation that varies directly or indirectly based on the value of referrals, without disclosing the relationship to the patient. *See* N.Y. Pub. Health Law § 238-d(1)(b).   Any disclosure must not only reveal to the patient the existence of the financial relationship, but must also inform the patient of his or her right to use a "specifically identified alternative" health care provider. *See* N.Y. Pub. Health Law § 238-d(2); *see also* 10 N.Y.C.R.R. § 34-1.5.   Any violation of Public Health Law Section 238-d by physicians also constitutes professional misconduct under New York Education Law Section 6530(48).

### 3.     New York Law Authorizes Insurers to Obtain Verification of Claims

43.     Under New York law, an "insurer is entitled to receive all items necessary to verify the claim directly from the parties from whom such verification was requested."   11 N.Y.C.R.R. § 65-3.5(c).

44.     New York law allows an insurer to request that a provider appear for an EUO and provide any other pertinent information that may assist in determining that a claim is payable, and the failure of a provider to appear for a timely requested EUO or to provide pertinent information constitutes a breach of a condition precedent to coverage, rendering it ineligible for No-Fault Benefits. *See Hertz Corp. v. Active Care Med. Supply Corp.*, 1 N.Y.S.3d 43, 45 (N.Y. App. Div. 2015) ("defendants' failure to attend the EUOs is a violation of a condition precedent to coverage that vitiates the policy").

45.     The prescribed No-Fault policy endorsement set forth in 11 N.Y.C.R.R. § 65-1.1 includes a specific section entitled "Conditions," which states in part that, "upon request by the Company, the eligible injured person or that person's assignee or representative shall . . . (b) as may reasonably be required, submit to examinations under oath by any person named by the Company and subscribe the same . . . , and (d) provide any other pertinent information that may assist the Company in determining the amount due and payable."  That policy endorsement, as set forth in 11 N.Y.C.R.R. § 65-1.1, further provides that "[n]o action shall lie against the Company, unless, as a condition precedent thereto, there shall have been full compliance with the terms of this coverage."

46.     The proof of claim requirement in the No-Fault policy endorsement, 11 N.Y.C.R.R. § 65-3.5(b), states in relevant part:

47.     Subsequent to the receipt of one or more of the completed verification forms, any additional verification required by the insurer to establish proof of claim shall be requested within 15 business days of receipt of the prescribed verification forms.  Any requests by an insurer for additional verification need not be made on any prescribed or particular form.

48.     Moreover, 11 N.Y.C.R.R. § 65-3.5(o) states in relevant part:

An applicant from whom verification is requested shall, within 120 calendar days from the date of the initial request for verification, submit all such verification under the applicant's control or possession or written proof providing reasonable justification for the failure to comply.  The insurer shall advise the applicant in the verification request that the insurer may deny the claim if the applicant does not provide within 120 calendar days from the date of the initial request either all such verification under the applicant's control or possession or written proof providing reasonable justification for the failure to comply.

49.     Thus, under New York law, an insurer is entitled to any information that is necessary for the insurer to determine whether the claim submitted by the health care provider is payable.

      **4.**      **Claims Decisions and Dispute Resolution Under New York's No-Fault Laws**

50.      Ordinarily, except in instances where an insurer has requested verification of a claim or claims, an insurer must pay or deny a claim within 30 days.  N.Y. Ins. Law. § 5106(a).

51.      In the event the insurer denies a claim or does not pay the claim in full, a provider may file a lawsuit in New York state court with the potential to recoup attorneys' fees, *see* N.Y. Ins. Law § 5106(a), or the provider can submit the dispute to "arbitration pursuant to simplified procedures[,]" N.Y. Ins. Law § 5106(b).

**B.**      **Defendants' Scheme Involves Financial Arrangements and Referrals for Medically Unnecessary Services**

52.      Defendants' scheme requires that the EDX Providers and the Shockwave Therapy Providers have access to patients upon whom services can be performed.  Their patients consist primarily of individuals who have been in motor vehicle accidents and who are treated at multidisciplinary Clinics throughout the New York metropolitan area.  The Referring Providers and/or individuals in control of the Clinics have not referred patients or made their patients available to the EDX Providers and the Shockwave Therapy Providers because their services are medically necessary, but instead have referred patients or otherwise made their patients available based on financial arrangements between the EDX Providers and the Shockwave Therapy Providers, on the one hand, and the Referring Providers and/or others who control the Clinics, on the other.

53.      Significantly, symbiotic relationships between the Referring Providers and the EDX Providers and the Shockwave Therapy Providers are reflected in the number of providers, including Rendering EDX Providers, who did work for both the Referring Providers and entities owned by Dr. Ahmed.  Rendering EDX Provider Dr. Chi has performed EDX Tests not only for the EDX Providers, but on behalf of Metro Pain and Smart Choice Medical, as well as Barakat

Medical Care, which is owned by Dr. Barakat. Dr. Barakat and Metro Pain referred patients to the EDX Providers and the Shockwave Therapy Providers. Similarly, Dr. St. Hill performed EDX Tests on behalf of Metro Pain, Smart Choice Medical, and Starrett City Medical. Dr. Boppana, who worked for the EDX Providers, was an employee of Starrett City Medical and Hillcrest Medical, both of which referred patients to the EDX Providers.

54. Financial arrangements between the EDX Providers and the Shockwave Therapy Providers and Referring Providers are sometimes disguised as lease agreements pursuant to which the EDX Providers and Shockwave Therapy Providers purport to pay "rent." Dr. Ahmed has claimed that his rent payments were for the use of space. But his testimony makes clear that the "rent" arrangements contemplate that clinic patients will be directed to his entities for services. For example, he has stated that the Rendering EDX Providers get to evaluate "patients that are being actively treated at that office. So if the patient is there in that office for treatment . . . they'll be advised to stop by and see the neurologist before they leave for an evaluation." "[G]enerally these are all active patients of the practice [*i.e.*, the various providers at the Clinic] and they're advised to stop by and see the neurologist before they leave that day. . . . ENS generally sees the active patients. Simple as that." Similarly, when asked how one patient was referred to Rendering EDX Provider Dr. Sherrie Rawlins, Dr. Ahmed stated "[t]hey [*i.e.*, the patient and Dr. Rawlins] were there [at the clinic] the same day, same time." The patient "goes to that office. That's where he gets his treatment."

1. **Improper Referrals for Neurological Examinations and EDX Tests**

55. Since Defendants' scheme began in or around April 2017, referrals for neurological examinations and EDX Tests have been made from a variety of Clinics. But Smart Choice Medical and Metro Pain are responsible for the vast majority of the referrals to ENS Medical, Atlantic Medical, and Northern Medical. During the period of time when Smart Choice

Medical and Metro Pain were referring patients to ENS Medical, Atlantic Medical, and Northern Medical, they accounted for referrals for over 65% of the EDX Tests performed by these EDX Providers.  The sheer number of referrals and the fact that the EDX Providers depended so exclusively on such a limited source of referrals are strongly indicative of improper financial arrangements even without consideration of other information.

### a.   Metro Pain

56.     Metro Pain operates at as many as 30 multi-disciplinary clinics in New York that cater to individuals who have been in automobile accidents.  At many of these locations, Metro Pain serves as the "gatekeeper," deciding what care patients receive and who will provide it in exchange for payment and pursuant to other improper financial arrangements.  Metro Pain acquired control of office space where patients could be treated, often through lease agreements, and engaged office staff and administrators to run the locations and direct patient medical treatment.  At each location, individuals working for Metro Pain and others purport to perform initial examinations purportedly to diagnose and treat the patients' conditions.  In fact, these examinations are not legitimately performed to determine the true nature and extent of patient injuries, but rather are performed, if at all, as a pretext to justify unnecessary treatment and services.  The examinations virtually always conclude that patients require a treatment plan consisting of a combination of purported physical therapy, chiropractic care, and acupuncture, as well as other services, including MRIs, and often are prescribed goods, including durable medical equipment and orthotic devices, and medications.  Indeed, Metro Pain physicians William Elton, M.D., has testified, and Jacob Keum, D.O., has provided a sworn affidavit that Metro Pain maintained a treatment protocol requiring physicians to order or prescribe goods and services, and they confirmed certain orders and prescriptions were issued under their name and license without their authorization or consent.  These services and goods are then provided by

other providers, not because they are necessary, but pursuant to "pay to play" financial arrangements with Metro Pain and others who are working with Metro Pain. Some providers are permitted to treat patients of Metro Pain because they make payments to Metro Pain in exchange for patient referrals, typically disguised as rent pursuant to a sublease for space in the clinic. Some patients are sent for MRIs at MRI providers owned by laypersons Yan Moshe ("Moshe") and Reuven Alon and pain management procedures performed at ambulatory surgery centers ("ASCs") owned by Moshe. In exchange, Dr. Shapiro was compensated by Moshe with, at least, a no-show job as medical director of Moshe's ASCs; primary, if not exclusive, rights to perform and bill for anesthesia at Moshe's ASCs through Dr. Shapiro's entity Premier Anesthesia Associates P.A.; and a loan against Metro Pain's receivables of $2.5 million.

57. Among the services for which patients are referred by Metro Pain are neurological examinations, EDX Tests, and Shockwave Therapy.

58. Metro Pain admits to operating as a gatekeeper at locations it controls, deciding what care is provided and who will provide that care based on financial arrangements with providers. Dr. Shapiro himself testified in an EUO on October 25, 2018, that Metro Pain staffs its locations with "general practitioners who see patients initially and [during] follow-ups, so they provide general medical services. They are gatekeepers who refer patients as necessary for conservative treatment, physical therapy, acupuncture, [and] chiropractors. They also refer patients. They look at the MRIs, EMG results, all tests and studies. Send [the patients] to an orthopedic consultation, pain management consultation and so forth and so on." Dr. Shapiro describes the arrangements with other providers at the clinics as involving payment for providers' "use of the premises, the tables, the waiting room, everything and anything, but basically they are there to see our patients and to provide services." According to Dr. Shapiro,

Metro Pain staffs its "gatekeeper" locations with medical doctors three days a week and pain management and orthopedists twice a month, which is "pretty much the rule for most offices where we cover all services." When sublessees who render care do not renew their sublease with Metro Pain or vacate a location for some other reason, Dr. Shapiro testified that it is his "responsibility" to find new health care providers to fill that space, which he does by consulting his contacts at other offices and locations.

59.     Financial arrangements between Metro Pain and providers to whom it referred patients were sometimes characterized as lease agreements through which providers would pay rent for the purported "use" of the premises. Such arrangements included agreements between Metro Pain and the EDX Providers. For example, Metro Pain purported to have entered into at least two such written License Agreements with Northern Medical for the use of space — one regarding 105-10 Flatlands and one regarding 204-12 Hillside — each for $1,500 per month. *See* Ex. 5. The forms of these two License Agreements were essentially identical to each other and to agreements that Metro Pain had with several other providers treating patients of Metro Pain at each of these two locations. *Cf. id. with* Ex. 6. The License Agreements granted to Northern Medical and the other providers the "right to license a portion of the Building including an examining room located in the Leased Premises and currently occupied by the Licensee on an exclusive basis and for those periods delineated on Schedule 'A' attached hereto." While rent payments were purportedly for the use of space, the agreements themselves revealed that payments were for access to patients and based on the value of the services rendered. For example, although Northern Medical treated patients at 105-10 Flatlands three or four days each month, it paid $1,500 per month to Metro Pain pursuant to its written licensing agreement, while a chiropractor who rendered services at the same location five days per week, four weeks per

29

month purportedly paid the same $1,500 per month rent.  Northern Medical's "rent" payments to Metro Pain were thus substantially higher and did not reflect market value for the use of space but the higher dollar value it could earn for EDX Tests compared to what the chiropractor could earn for chiropractic treatment.  Indeed, other provider agreements explicitly tied rent to the services being provided:  one Metro Pain agreement with a physical therapy provider for space at 105-10 Flatlands described the rent explicitly as "$1500 for ROM Testing, $1500 for Functional Capacity [Testing], $1500 rent for PT" (*i.e.*, $4,500 total rent each month); while one with a different physical therapy provider for space at 204-12 Hillside described the rent explicitly as "1500$ [*sic*] for Functional Capacity Testing, 1500$ [*sic*] for ROM Testing, 1500$ [*sic*] for rent" (*i.e.*, $4,500 total each month).

60.     There is no indication that sums reflected in the License Agreements represent all of the amounts paid by providers to Metro Pain.  But even if they did, Metro Pain would have been receiving as purported rent under all of the agreements together amounts from providers close to, and almost certainly well in excess of, what Metro Pain was paying the property owner for Metro Pain's use of the physical space at each location.  For example, Metro Pain's profit and loss statements reflect that it only paid monthly rent of about $7,600 during 2018 for the entire space at 105-10 Flatlands.  However, the License Agreements with Northern Medical, the physical therapist, and the chiropractor entitled Metro Pain to monthly rent of at least $7,500 each month, and billing records reflect that at least 11 other health care providers rendered services to Metro Pain patients at 105-10 Flatlands in 2018.  Metro Pain maintained similar sublease arrangements with providers at 204-12 Hillside.  As a result, it is clear the payments to Metro Pain from providers were not tied to the fair market value of space used by the providers, but rather were for access to patients.  During the period the Northern Medical leases were in

effect, the EDX Providers examined and performed EDX Tests on patients at 105-10 Flatlands and 204-12 Hillside, and other locations at which Metro Pain operated.

### b.      Smart Choice Medical

61.     Like Metro Pain and Dr. Shapiro, Smart Choice Medical and Dr. Chumaceiro controlled Clinic locations and entered into financial arrangements with other providers at those Clinics in exchange for the referral of Smart Choice Medical's patients.

62.     Smart Choice Medical's former practice administrator, Anthony DiPietro, testified during a January 14, 2020 deposition that Dr. Chumaceiro rented space to various providers, including a neurologist, who "came in and did testing, approximately twice a month" and that the "fee . . . was $1,500, maybe from the EMG" provider.  He also testified that in exchange for those fees, the providers "were servicing [Dr. Chumaceiro's] . . . patients, his referrals."  While DiPietro did not identify the name of the EMG provider that paid the "fee" and received referrals, the predominant providers of EDX Tests to Smart Choice Medical patients during the period when DiPietro was practice administrator were Northern Medical from mid-2017 to mid-2018 and ENS Medical from mid-2018 to when Smart Choice Medical ceased operating in mid-2019.

63.     Dr. Chumaceiro and Smart Choice Medical have ordered treatment as a result of illegal financial arrangements.  Dr. Chumaceiro, his wife, and his daughter received over $10,000 from shell companies affiliated with 21st Century Pharmacy Inc. and Rx For You Corp., pharmacies that filled Dr. Chumaceiro's patient prescriptions and were discussed in allegations in *State Farm Mutual Automobile Insurance Company v. 21st Century Pharmacy Inc.*, 1:17-cv-05845-MKB-VMS (E.D.N.Y).  Dr. Chumaceiro's practice, Smart Choice Medical, also received at least $270,000 from an alleged *de facto* owner of 21st Century Pharmacy and close business associate of the owner of Rx For You Corp.  In *GEICO v. Chumaceiro*, 1:20-cv-02220-EK-PK

(E.D.N.Y.), it is alleged that Dr. Chumaceiro, Smart Choice Medical, and others defrauded GEICO through the submission of fraudulent bills for medically unnecessary examinations, physical therapy, and medical tests, including EDX Tests, among other services.  Smart Choice Medical and Dr. Chumaceiro have been named as defendants in other lawsuits alleging the fraudulent treatment of patients pursuant to improper financial arrangements and illegal layperson control over Smart Choice Medical, including *GEICO v. Chumaceiro*, 1:20-cv-02220-EK-PK (E.D.N.Y. May 18, 2020).   In that lawsuit, it is alleged that Dr. Chumaceiro, Smart Choice Medical, and others submitted fraudulent bills for medically unnecessary examinations, physical therapy, and medical tests, including EDX Tests, and that Smart Choice Medical purported to be owned on paper by Dr. Chumaceiro, but was in fact owned and controlled by a group of lay persons, including Peter Khaim a/k/a Peter Khaimov ("Khaim"), Aleksandr Gulkarov ("Gulkarov"), Roman Israilov ("Israilov"), and DiPietro who served as Smart Choice Medical's practice administrator.  These laypersons are alleged to have owned and controlled Smart Choice Medical based on evidence that:  (1) Khaim owns 409 Rockaway and held the lease at 1767 Southern and leased the space to Smart Choice Medical for significant rent; (2) these laypersons controlled leasing and financial arrangements with other providers operating at 409 Rockaway and 1767 Southern; (3) Dr. Chumaceiro borrowed at least $270,000 from Khaim's associate, Tariel Begiyev ("Begiyev"), through Begiyev's company, New Business Funding Inc.; (4) Smart Choice Medical's practice administrator, DiPietro, assisted Dr. Chumaceiro with incorporating Smart Choice Medical; introduced Khaimov and Begiyev to Dr. Chumaceiro; recommended the engagement of Israilov and his marketing company, All Network Marketing Corp.; hired and fired administrative staff; arranged for Gulkarov to handle billing for Smart Choice Medical through his company, "Billing 4 You," (presumably Billing For You,

Inc.); and handled Smart Choice Medical's electronic deposits using a scanner that allowed him access to Smart Choice Medical's bank account; (5) Dr. Chumaceiro did not control his two signature stamps — DiPietro controlled one and Gulkarov/Billing For You controlled the other; and (6) while Dr. Chumaceiro purported to be Smart Choice Medical's sole owner, he typically worked at Smart Choice Medical less than 15 hours per week and was, "at all relevant times" (presumably from approximately 2016 through at least May 2020) a staff doctor at St. John's Riverside Hospital in Yonkers, New York. More recently, Dr. Chumaceiro has pleaded guilty to, among other things, conspiracy to commit healthcare fraud and money laundering in a federal prosecution in which he and other defendants, including Smart Choice Medical's former administrator, DiPietro, and Khaim, Israilov, and Gulkarov, are alleged to have been involved in a no-fault fraud scheme. *See United States v. Gulkarov, et al.*, 1:22-cr-00020-PGG (S.D.N.Y.). Pursuant to the scheme, laypersons including DiPietro, Khaim, Gulkarov, and Israilov, bribed 911 operators, hospital employees, and others for information related to auto accident victims. They then paid runners, who used the information to contact and induce them to receive treatment at clinics, including Smart Choice Medical, where they received medically unnecessary treatment. As part of his guilty plea, Dr. Chumaceiro has admitted Smart Choice Medical was nominally owned by him but was actually controlled by laypersons, and that he also prescribed medically unnecessary treatment that was fraudulently billed to no-fault insurers.

64.     Dr. Chumaceiro has had every incentive to enter into improper financial arrangements in exchange for referring patients to the EDX Providers for EDX Tests as he has had financial troubles since at least 2007. On October 5, 2007, Dr. Chumaceiro filed a voluntary petition for Chapter 13 bankruptcy in the Southern District of New York. Prior to that, on three separate occasions, foreclosure proceedings were filed against him. Moreover, at least six

additional lawsuits were filed against Dr. Chumaceiro between May 2014 and March 2019 to foreclose on his properties and to recover unpaid debts. In addition, multiple tax liens and/or judgments have been entered against him and his wife. Dr. Chumaceiro's financial condition and poor credit during this period almost certainly precluded him from obtaining the capital necessary to form Smart Choice Medical, secure a lease for space at which it would operate, employ administrative staff, and cover other expenses associated with the business. Dr. Chumaceiro would have been under significant pressure to enter into financial arrangements in exchange for patient referrals.

65.     In fact, initially, Metro Pain provided services at Smart Choice Medical's Clinics and was granted access to Smart Choice Medical's patients in exchange for payment. Sometime in 2017, Smart Choice Medical entered into a purported sublease with Metro Pain for space at 409 Rockaway for $1,000 per month. Although disguised as an agreement for the use of space, this arrangement was for Metro Pain to obtain access to Smart Choice Medical patients and the ability to render services. Indeed, it is apparent from the face of the agreement itself, which is a form agreement signed by Dr. Shapiro on behalf of Metro Pain but is unsigned as to Smart Choice Medical, that its formal terms were unimportant and that the purpose of the agreement was to paper over the improper financial arrangements between Smart Choice Medical and Metro Pain. For example, the sublease identifies no specific effective date, providing only that the sublease was "made on the ___ day of ___, 2017", and that "This Sub-Lease shall be for a term of five years with an option to renew, commencing on ___, and ending '2022' unless this Sub-Lease terminates earlier . . . ." Ex. 7. In addition, it sets forth in handwriting that Metro Pain's address is "Smart Choice." It also fails to specifically identify what Metro Pain would use the space for other than to vaguely state: "to be used by Tenant only as a 'Medical.'" During the

period of this sublease agreement, Metro Pain provided pain management and orthopedic consultation services to patients of Smart Choice Medical at 409 Rockaway, and then performed injections and other procedures on those patients at ASCs in New Jersey, including those owned by Moshe.

66.     Metro Pain took over Smart Choice Medical's operation at 1767 Southern in or about August 2018, and at 409 Rockaway in or about early-to-mid 2019.  Smart Choice Medical's former practice administrator, DiPietro, testified that Metro Pain purchased Smart Choice Medical.  At 1767 Southern, Smart Choice Medical stopped treating patients in July 2018, Metro Pain entered into a lease with the property owner dated August 1, 2018, thereby effectively assuming control over that space, and Metro Pain became the primary provider of initial examinations of patients at the address in July 2018.  At 409 Rockaway, Smart Choice Medical stopped treating patients in mid-2019, and Metro Pain became the primary provider of initial examinations of patients and outcome assessment tests at the address in March 2019. DiPietro also testified on January 14, 2020, that Dr. Shapiro, Metro Pain's owner, had as of that date acquired Smart Choice Medical's practices at 409 Rockaway and 1767 Southern from Dr. Chumaceiro.  After the purported sale, DiPietro continued to work as a practice administrator for Metro Pain.  Dr. Chumaceiro also began to work for Metro Pain, as did other doctors who had worked for Smart Choice Medical, including Dr. Yana Abayev.  After Metro Pain acquired Smart Choice Medical, doctors who had referred patients to the EDX Providers while working for Smart Choice Medical continued to do so while working for Metro Pain.

### c.     Patients Treated by Queens Medical

67.     Like ENS Medical, Atlantic Medical, Northern Medical, and Terrace Medical, Queens Medical has required a flow of patients on whom neurological examinations and EDX Tests could be performed.  While Queens Medical does not identify its service locations on

documentation submitted to the State Farm Companies, it appears to operate out of multiple locations in the New York metropolitan area, including 214-29 Jamaica and 221-05 Jamaica where Dr. Ahmed himself purports to perform most of the neurological examinations and EDX Tests. Dr. Ahmed has testified that Queens Medical also performed services at 3703 92nd Street, 11 East Hawthorne, 21 Washington Avenue, 102-34 Atlantic Avenue, 9413 Flatlands, 1530 Bedford, 607 Westchester, 488 Lafayette, and 560 Prospect.

68.     Queens Medical claims to pay rent for the use of space in these locations, but, in fact, its purported leases are shams to hide payments for access to patients. Dr. Ahmed has admitted that Queens Medical's lease agreements do not provide for use of space on any fixed days of the month. Rather, arrangements involve individuals affiliated with locations communicating with Queen's Medical employees Svetlana Kay or Sarah Anthony, to "let us know what is a good day for us to come when patients are expected to be there."

69.     Queens Medical appears to have a strong referral relationship with one doctor in particular. Medical records of patients who received neurological examinations and EDX Tests from Queens Medical do not indicate a referral source, although Queens Medical's neurological examination reports consistently state in preprinted form: "Thank you for the courtesy of this referral." Over 75% of the EDX Tests that Queens Medical performed on the State Farm Companies' insureds over a more than three-year period were rendered to patients who had received treatment prior to or on the same day from a single doctor, and Dr. Ahmed has admitted that the doctor may have referred patients to Queens Medical.

70.     Queens Medical and this particular doctor shared office space at 214-29 Jamaica and 221-05 Jamaica and may have used the same billing company when operating from those two addresses. Bills submitted to the State Farm Companies by both Queens Medical and this

doctor for services rendered at 214-29 Jamaica and 221-05 Jamaica appear to have been prepared by the same billing company because they are submitted on CMS 1500 forms (as opposed to New York issued NF-3 forms), fail to include an address in the "Service Facility Location Information" (Box 32), and contain the same handwritten notation or stamp where the provider's signature should be included (Box 31) stating, "Signature on File." *See, e.g.*, Ex. 8. The doctor's bills for services rendered at other addresses appear to be prepared by a different billing company as they are submitted on New York issued NF-3 forms, state a service facility address, and do not include any handwritten notation, instead typing in the doctor's name in the space provided for signature. *See, e.g.*, Ex. 9. The identity of that billing company is unknown. However, both Queens Medical and the doctor shared office space with Svetlana Kay at 214-29 Jamaica, which was the business address of Svetlana Kay's property holding company and two billing companies that she owns and/or manages. Queens Medical and the doctor also used space owned by Svetlana Kay at 221-05 Jamaica, and Dr. Ahmed testified that Svetlana Kay is, among other things, Queens Medical's biller and landlord at 221-05 Jamaica. The sheer number of overlapping patients and connections between the doctor and Queens Medical suggests the doctor was the source of Queens Medical patients and that they were the result of improper financial arrangements.

71.     Significantly, however, this doctor was prohibited from referring patients for EDX Tests based on a disciplinary sanction imposed on him by OPMC. In September 2009, the doctor was charged with professional misconduct by OPMC for failing to adequately supervise his staff in their performance, evaluation, and documentation of examinations and electrodiagnostic testing. In October 2009, the doctor entered into a consent agreement with OPMC pursuant to which (a) his medical license was suspended for three years; (b) he was

required to pay a $10,000.00 fine; and (c) he was **permanently** barred from (i) ordering, performing, or interpreting any electrodiagnostic nerve and muscle studies (*i.e.*, EDX Tests) and (ii) forming, owning, controlling, or practicing under the auspices of more than one professional medical corporation.  Thus, after October 2009, the doctor could not refer his patients for EDX Tests.  If he did refer patients to or otherwise direct them to Queens Medical for neurological examinations and EDX Tests, the doctor and Queens Medical would almost certainly have taken steps to ensure that there was no documentation of such referrals.  Consistent with such a possibility, Queens Medical's documentation provides no indication of who referred its patients for neurological examinations and EDX Tests.  Notably, the doctor is a defendant in the federal civil action *GEICO v. Exon Medical Equipment, Inc.*, 1:20-cv-02457-RRM-PK (E.D.N.Y.), which alleges the doctor prescribed patients covered under a No-Fault insurance policy medically unnecessary durable medical equipment and orthotics pursuant to unlawful financial arrangements, including at Clinics operating at 214-29 Jamaica, 488 Lafayette, and 560 Prospect.

72.     Given the close association between the doctor and Queens Medical, the significant number of overlapping patients between the doctor and Queens Medical, the prohibition on the doctor's ability to make referrals for EDX Tests, and the absence of any indication in Queens Medical's records of the source of referrals for its EDX Tests, it is highly likely that the doctor was a source for Queens Medical's patients and that there was a financial relationship between Dr. Ahmed and Queens Medical and the doctor.  If Queens Medical's neurological examinations and EDX Tests were the result of such financial relationships and/or a product of referrals by the doctor prohibited by an OPMC order, they would have been ineligible for reimbursement.

## 2.    Improper Referrals for Shockwave Therapy

73.     Similar to methods used to obtain patients for the EDX Providers, the Shockwave Therapy Providers obtained patients through improper financial arrangements sometimes characterized as lease arrangements in which the Shockwave Therapy Providers pay rent for the purported "use" of space.

74.     Dr. Ahmed testified that East Coast Medical, Garden Medical, and Go Medical do no marketing or advertising whatsoever. Rather, Dr. Ahmed testified on behalf of East Coast Medical that "front-desk staff" at locations where it operates send patients for treatment. According to Dr. Ahmed, "the facilities are places where people who have been in auto accidents . . . come for treatment. So every patient in the facility that's undergoing physical therapy technically could be a candidate for shockwave. You know, it's not that we need to pick and choose patients at a facility. The facilities have patients that are undergoing treatments, and" "the front-desk staff" tell the patients "that [Dr. Ahmed] is there . . . ."

75.     Dr. Ahmed has testified that he has a written lease with each location at which East Coast Medical, Garden Medical, and Go Medical perform examinations and Shockwave Therapy. He explained that at each of these locations East Coast Medical, Garden Medical, and Go Medical pay a per diem fee for access to the facility. He testified that such leases exist for 90-16 Sutphin Boulevard, a "Metro Pain . . . location," and 4014 Boston Road and 441 Willis Avenue, locations at which Dr. Barakat provides services. There are also leases for East Coast Medical at 14 Bruckner Boulevard and 60-40 82nd Street.

76.     The forms of the leases themselves give every indication that they are not fair-market agreements for the use of space but a ruse to hide payments for access to patients. The leases for 4014 Boston Road and 14 Bruckner Boulevard are identical, although they involve different locations and different landlords. *See* Ex. 10. The former agreement is with Barakat's

entity Bronx County Medical, while the latter is with Liberty Rhea Ranada Ebarle, PT PC owned on paper by Liberty Rhea Ranada Ebarle.  Under both agreements, East Coast Medical is identified as the "licensee" and the landlord is identified as the "licensor" who has control of the space as a "subtenant" pursuant to some undescribed sublease.  While both agreements state that East Coast Medical is renting "exclusive use of certain space," the space is not defined.  Rather, both agreements contain an identical ambiguous reference to "Licensed Office Space: 2 Rooms designed as Office(s) A and B at $48.00 per square foot."  Rent calculations are purportedly laid out in an attached Exhibit A, which is identical in both leases and appears to rent space at a rate of $463.49 per four hour session.  The calculations on Exhibit A reference personnel being provided and their cost (including a receptionist, 2 medical assistants, a patient coordinator and an office manager), the cost of supplies, the rate for the use of space, and a 10% adjustment over cost.  But the calculations make no sense, do not add up, and have no correlation to the reference on Exhibit A to "$48 per square foot."  Nothing about these calculations and the rent amount suggests any connection between rent payments and an exclusive use of space.  Indeed, on its face, the documents contemplate payment for "each 4-hour session" in "a single business day," reflecting payment for the opportunity to be in the office during a narrow window when, as Dr. Ahmed testified, front desk staff will send patients.

77.    The lease governing 60-40 82nd Street is similarly structured.  Under that agreement with PDA NY Chiropractic P.C. ("PDA Chiropractic"), East Coast Medical purports to rent space.  But the start and end date are vaguely defined as "OCT/2020" to "OCT/2021" and the space is generally referenced as the entire space belonging to PDA Chiropractic when the space was almost certainly being shared by multiple providers all of whom were paying purported rent.

78.     During the period these agreements were in place, East Coast Medical provided Shockwave Therapy to patients of Metro Pain at 90-16 Sutphin, Dr. Barakat at 4014 Boston Road, Liberty Rhea Ranada Ebarle PT at 14 Bruckner Boulevard, and PDA Chiropractic at 60-40 82nd Street.  East Coast Medical gained access to these patients pursuant to improper financial payments under the guise of these purported agreements.

79.     In some instances, the Shockwave Therapy Providers submit documentation purporting to represent that patients have been referred for Shockwave Therapy treatment by a medical professional.  East Coast Medical sometimes submits "RPW Referral Forms" in which a physician certifies "that the above RPW/Shockwave Treatment Plan [for Shockwave Therapy] are medically necessary [*sic*] and approved by me[,]" Ex. 11.  Such documents include instances of purported referrals by Metro Pain and Dr. Barakat.   Other forms submitted by the Shockwave Therapy Providers sometimes note that the "patient has been recommended by her PCP to continue . . . [Shockwave Therapy]," even though no such doctor is identified and other patient records rarely, if ever, reflect any such recommendation.

80.     The same type of improper financial arrangements pursuant to which East Coast Medical, Garden Medical, and Go Medical obtain patients also certainly existed as to Town Medical because (1) East Coast Medical, Garden Medical, Go Medical, and Town Medical are all owned and controlled by Dr. Ahmed; (2) the EDX Providers, which are owned and controlled by Dr. Ahmed, routinely paid for and relied upon such payments in order to obtain access to patients; and (3) Town Medical provided the same services as East Coast Medical, Garden Medical, and Go Medical, and all four are transient providers delivering those services at multiple No-Fault Clinics throughout the New York metropolitan area.

3.     **Improper Financial Arrangements for Patient Referrals Violated New York Law**

81.     The EDX Providers and Shockwave Therapy Providers obtained access to patients on whom they could perform tests and procedures pursuant to direct and indirect financial arrangements with Referring Providers and/or others who controlled the Clinics.

82.     These financial arrangements, which were sometimes disguised as "rent," violated the above-described New York licensure laws prohibiting unlawful referrals and steering patients to a particular provider of health care goods and services.  *See* ¶¶ 39–42 above.  These laws are designed to protect the public health, safety, and welfare by eliminating improper financial incentives that may cause providers to refer patients for services that are in the best economic interest of the referring providers and those who make unlawful payments for the referrals, but are not in the best interests of the patients, because such conduct may result in:  (a) the referral of patients for medically unnecessary services; (b) the referral of patients to providers who unlawfully pay kickbacks to induce the referrals as opposed to other providers who may provide services that are in the patients' best interest, but who do not offer to pay unlawful kickbacks; and (c) increased charges to account for additional hidden fees that are designed to recoup the payment for securing the referral.

83.     These financial arrangements were the basis upon which the EDX Providers and the Shockwave Therapy Providers gained access to patients, and therefore the EDX Providers and the Shockwave Therapy Providers were ineligible for No-Fault reimbursement, and under these circumstances, it would be unlawful and inequitable to allow the EDX Providers, Rendering EDX Providers, Shockwave Therapy Providers, or the Rendering Shockwave Therapy Providers to retain any benefits obtained from such arrangements.  *See* 11 N.Y.C.R.R. § 65-3.16(a)(12) (a provider of health care services is not entitled to No-Fault benefits if the provider

fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York).

### C.      Legitimate Neurological Examinations, NCVs, and EMGs

84.     The human nervous system is composed of the brain, spinal cord, and peripheral nerves, which extend throughout the body, including the arms and legs, and into the hands and feet.  Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.  The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.

85.     Peripheral nerves consist of both sensory and motor nerves.  They travel throughout the body and extend from the hands and feet through the arms and legs and into the spinal cord.  The peripheral nerves come together at various specific points along the spine before traveling up the spinal cord to the brain.  The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called nerve roots.   Damage or injury to a nerve root is called a radiculopathy and can cause various symptoms, including pain, altered sensation, diminished reflexes, and loss of muscle control.

86.     Motor vehicle accidents can cause damage or injuries (*i.e.*, radiculopathies) to the nerve roots at one or more levels of the spine on one or both sides of the spine.

87.     If EDX Tests are properly performed and interpreted, they can be used to diagnose the existence, nature, extent, and specific location of nerve injuries, including neuropathies (*i.e.*, injuries to the peripheral nerves that course through and supply muscles in the upper and lower extremities with nerve impulses) and radiculopathies (*i.e.*, pinched or injured

43

nerve roots that run along both sides of the spine at each vertebra level and through which sensory signals travel from the peripheral nerves into the spinal cord and up to the brain, and motor signals travel from the brain to the spinal cord and into the peripheral nerves to initiate muscle activity throughout the body).

88.     If EDX Tests are performed, the indications and results should be documented for the benefit of:  (a) the licensed professionals involved in the patient's care; (b) other licensed professionals who may treat the patient contemporaneously or subsequently; (c) the patients themselves whose care necessarily depends on the legitimate documentation of this information; and (d) payors such as the State Farm Companies so that they can pay for reasonable and necessary treatment.

### 1.     Nerve Conduction Velocity Tests

89.     NCVs are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with electrical currents.  The velocities, amplitudes, and shapes of the responses are then recorded by electrodes attached to the surface of the skin, and are reflected on waveforms and in numerical data that are generated by the machines used to perform the NCVs.  The velocities, amplitudes, and shapes of the responses, as reflected on the waveforms and in the numerical data, are then compared with well-defined normal ranges of responses to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and/or motor nerve fibers of the peripheral nerves in the arms and legs being tested.

90.     Several peripheral nerves in the arms and legs can be tested with NCVs. Moreover, many of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCVs.  The decision of which peripheral nerves to test in each limb, whether to test the sensory fibers, motor fibers, or both, in any peripheral nerve, and whether there is any legitimate reason to test the peripheral nerves in a non-symptomatic limb,

should be tailored to each patient's unique circumstances.  In a legitimate clinical setting, this decision is based on the unique circumstances of each patient, including a history and physical examination of the individual patient, the presenting symptoms, and the real-time test results obtained as the NCVs are performed on the sensory and/or motor fibers of each peripheral nerve. Accordingly, the nature and number of peripheral nerves tested, the types of nerve fibers within each peripheral nerve tested, and whether non-symptomatic limbs should be tested with NCVs, as well as the results of each test, should vary among patients.  Additionally, to minimize the discomfort and costs of NCVs for patients, the number of nerves, nerve fibers, and limbs tested should be the minimum necessary to address the clinical issue presented.

### 2.    Needle Electromyography Tests

91.    EMGs involve the insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to evaluate the electrical activity in each such muscle.  When EMGs are performed, the electrical activity in each muscle is viewed in real-time in the form of waves on an oscilloscope, and the sound of the electrical activity is amplified by an audio amplifier attached to the tip of the needles inserted into the muscles.  The appearance of the waveforms and the sounds of the electrical activity are then compared with well-defined normal ranges to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

92.    At least 25 different muscles in the upper extremities, as well as several paraspinal muscles that extend along all levels of the cervical spine, should be considered and can be tested through EMGs depending on the unique circumstances of each patient.  Further, at least 21 different muscles in the lower extremities, as well as several paraspinal muscles that extend along all levels of the lumbar spine, should be considered and can be tested through EMGs.

93.     Each muscle in the upper and lower extremities is innervated (*i.e.*, supplied with nerve impulses) by one peripheral nerve and nerve roots at two to four levels of the spine (*e.g.*, the biceps brachii muscles in the arms are innervated by the musculocutaneous peripheral nerve and the nerve roots at the C5 and C6 levels of the cervical spine).  Therefore, if an EMG is performed on the biceps brachii muscles and produces an abnormal result, it could indicate an injury to the musculocutaneous peripheral nerve, the nerve root at the C5 level of the spine, the nerve root at the C6 level of the spine, or some combination of those injuries.  Accordingly, to determine the existence, nature, and source of the injury, EMGs would typically be performed on other upper extremity muscles that are innervated by different peripheral nerves and the nerve roots at either the C5 or C6 level of the spine, but not both, to identify the existence or non-existence of abnormalities in those other muscles.  If abnormalities are identified in other muscles innervated by the nerve roots at the C6 level of the spine but are not identified in other muscles innervated by the nerve roots at the C5 level of the spine, it could suggest a radiculopathy at the C6 level of the spine, so long as other circumstances are consistent with such a diagnosis.  In that case, EMGs would typically be performed on other muscles innervated by the nerve roots at the C6 level of the spine to determine if abnormalities could be detected in those muscles that would be consistent with a C6 radiculopathy, as well as other muscles innervated by surrounding nerve roots C5 and/or C7 to rule out radiculopathies at those levels.

94.     Therefore, the decision of which limbs to test, as well as which muscles and nerves in each limb to test through the use of EMGs, should vary depending on the unique circumstances of each patient, including the history and physical examination of the individual patient and his or her presenting symptoms.  After the EMG begins, the decision of which limbs, and which muscles and nerves in each limb to test should vary depending on the real-time results

of the NCVs that are obtained during the same visit and the real-time results of the EMGs as they are performed on each specific muscle or nerve in order to reach a diagnosis.  Thus, the number of limbs, as well as the nature and number of muscles, peripheral nerves, and nerve roots tested in each limb, should vary to reach diagnoses that are individually tailored to each patient's unique circumstances.  Additionally, to minimize the discomfort, risk, and costs of EMGs for patients, the number of muscles, peripheral nerves, nerve roots and limbs tested should be the minimum necessary to address the clinical issue presented.

95.     In addition to the variety of limbs, and muscles and nerves in each limb that can be tested, the results of EMGs may further vary according to two processes known as denervation and reinnervation.  Specifically, when radiculopathy occurs and it is severe enough to interfere with or disrupt nerve function, a process called denervation will often occur within the first two to five weeks after the date of the injury.  During the denervation process, muscle fibers within one or more muscles will become disconnected from the nerve branches of the peripheral nerves that normally feed and control those muscle fibers, and those disconnected muscle fibers will begin firing involuntarily.  Muscle fibers that fire involuntarily during the denervation process typically produce abnormal electrical activities known as fibrillations and positive sharp waves, which can be seen in the waveforms and heard from the sounds produced during EMGs.

96.     If fibrillations and positive sharp waves are detected during EMGs, their degree of severity is measured on a scale of +1 to +4, which is important to determine the extent of the injury and disruption to nerve function.  The standards for scoring the degree of severity on the scale of +1 to +4 are well defined, namely through their appearance on the oscilloscope and their sound.  In terms of appearance, the EMG examiner should be able to identify fibrillations and

47

positive sharp waves by viewing the electrical activity in the muscle as it appears on the oscilloscope, namely:  0 means none present; +1 means persistent single trains of potentials (> 2–3 seconds) can be seen in at least two areas;[1] +2 means moderate number of potentials can be seen in three or more areas; +3 means many potentials can be seen in all areas; and +4 means full interference pattern of potentials.  When fibrillations and positive sharp waves are present, they typically also produce a "rain on the roof" sound, the intensity of which generally corresponds to the severity of the fibrillations and positive sharp waves that can be seen on the oscilloscope.

97.    When denervation occurs or shortly thereafter, a process called reinnervation naturally begins to occur.  During reinnervation, healthy muscle fibers that are adjacent to the injured fibers and that have not been disrupted by a radiculopathy will begin to grow additional healthy nerve fibers to connect to and feed the injured muscle fibers so that they can resume their normal function.  This process is called "collateral sprouting."  The "collateral sprouting" process produces abnormal electrical activity known as motor unit potentials, which can be seen and heard during the EMGs in various forms, including abnormal amplitudes, durations, polyphasia, and recruitment responses.  If abnormal motor unit potentials are detected through EMGs, their degree of severity should also be measured on a scale of +1 to +3, which is important to determine the extent of the injury and interference with or disruption to nerve function.

98.    Therefore, when EMGs are performed within the first two to five weeks following a motor vehicle accident on individuals with actual radiculopathies, one would initially expect to find signs of denervation in some but not all such individuals depending on whether the radiculopathies were severe enough to cause denervation.  For those patients who are

---

[1] "Potentials" appear as spikes or waves on the oscilloscope.

experiencing denervation, one would expect the process of denervation to occur in some muscles but not every muscle that is tested, and if signs of denervation are detected (*i.e.*, fibrillations and positive sharp waves), one would expect that the severity of the denervation process would vary in the different muscles that are tested in each patient, leading to different measurements on the +1 to +4 scale.  Furthermore, if an individual is experiencing the process of denervation in any muscle, one would expect to detect signs of reinnervation occurring in the same muscles (*e.g.*, abnormal motor unit potentials), and the severity of the reinnervation process would vary in the different muscles that are tested in each patient, again leading to different measurements along the +1 to +3 scale.

### 3.    The AANEM Recommended Policy

99.    The American Association of Neuromuscular & Electrodiagnostic Medicine ("AANEM"), founded in 1953, is the largest worldwide organization dedicated solely to the scientifically based advancement of neuromuscular medicine.  AANEM membership is comprised of over 5,000 physicians, primarily neurologists and physiatrists.  AANEM's primary goal is to increase the quality of care for patients with neurological disorders through programs in education, research, and quality assurance.  AANEM has issued a Recommended Policy ("Recommended Policy") regarding the optimal use of EDX Tests, including NCVs and EMGs, to diagnose various forms of nerve abnormalities, including peripheral nerve injuries and radiculopathies. *See* Ex. 12.  The Recommended Policy has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

100.    The Recommended Policy arises out of the recognition that EDX Tests "have occasionally been abused by some providers, resulting in overutilization and inappropriate consumption of scarce health resources."  The Recommended Policy accurately reflects the

demonstrated utility of various forms of EDX Tests, including NCVs and EMGs, for diagnosing radiculopathies and other disorders of the central and peripheral nervous systems.

101.   The Recommended Policy recognizes that "EDX studies are individually designed by the EDX physician for each Patient" and that "[t]he examination design is dynamic and often changes during the course of the study in response to new information obtained." Therefore, the decision of which nerves and muscles, if any, should be tested with NCVs and EMGs should be individually tailored by a physician to address the unique circumstances of each patient based upon a history and examination of the patient, the patient's presenting symptoms, the real-time results as the NCVs and EMGs are performed, as well as various other circumstances that may be unique to each patient.

102.   According to the Recommended Policy, the *maximum* number of EDX Tests that should be required to diagnose radiculopathy in more than 90% of patients is: (a) NCVs of three motor nerves and two sensory nerves, and (b) EMGs of two limbs. Because the amounts charged for EDX Tests are typically based upon the number of nerves subjected to NCVs and the number of limbs subjected to EMGs, the Recommended Policy explains that these maximum numbers "are to be used as a tool to detect outliers so as to prevent abuse and overutilization." The Recommended Policy also states that "[t]he number of tests performed should be the minimum needed to establish an accurate diagnosis," and "in the small number of cases which require testing in excess of [these maximum numbers] . . . the physician should be able to provide supplementary documentation to justify the additional testing. Such documentation should explain what other differential diagnostic problems needed to be ruled out in that particular situation."

### 4.    Charges for EDX Testing

103.    Providers of EDX Tests submit charges based on the number of motor and sensory nerves subjected to an NCV and the number of limbs subjected to an EMG.

104.    Between January 2017 and October 2020, the New York Worker's Compensation Medical Fee Schedule (the "New York Fee Schedule"), which governs No-Fault reimbursement rates, allowed providers of EDX Tests in and around New York City to bill approximately (i) for NCVs $166.46 for each motor nerve tested; (ii) for NCVs $106.47 for each sensory nerve tested; and, (iii) for EMGs with or without paraspinal muscles, $185.73 for one limb, $241.50 for two limbs, $314.34 for three limbs, and $408.64 for four limbs.

105.    Effective October 1, 2020, the New York Fee Schedule incorporated seven new Current Procedural Terminology ("CPT") codes governing NCVs. These new CPT codes define a single nerve conduction study to include (i) a sensory nerve conduction test, (ii) a motor nerve conduction test with or without an F-wave test, or (iii) an H-reflex test. While the new codes permit EDX providers to bill incrementally larger amounts based on the number of nerve conduction studies performed, providers may only bill up to 13 studies (CPT Code 95913), which caps the maximum reimbursement amount for NCVs at $653.46. CPT codes governing EMGs were not updated with the amendments that became effective on October 1, 2020.

106.    Thus, at all relevant times, the EDX Providers have a direct financial incentive to test and bill for testing the maximum number of motor and sensory nerves on NCVs and the maximum number of limbs, four, on EMGs. The more nerves tests on NCVs and the more limbs tested on EMGs, the more the EDX Providers could profit. The EDX Providers have taken advantage of and maximized the pricing for NCVs set forth in the Fee Schedule. Prior to the change in the Fee Schedule in October 2020, the EDX Providers routinely submitted charges for NCV studies of 8 motor nerves and 10 sensory nerves per patient (whether on a single date of

service or over multiple dates of service).  Since the change in the Fee Schedule in October 2020, the EDX Providers have routinely submitted charges for NCV studies of 11–12 studies or 13+ studies per patient.

### D. The Fraudulent Neurological Examinations, NCVs, and EMGs Performed by the EDX Providers

107.    Based on referrals from the Referring Providers, the EDX Providers and the Rendering EDX Providers subjected patients to medically unnecessary neurological examinations, NCVs, and EMGs to maximize profits.  *See, e.g.*, Ex. 13.  The neurological examination reports typically reported complaints, findings, and diagnoses to justify EDX Tests, and concluded EDX Tests were necessary.  EDX Tests provided and billed by the EDX Providers and the Rendering EDX Providers were conducted in a uniform fashion, were not tailored to the individual needs of any particular patient, and yielded results that were not credible.

#### 1. The Neurological Examinations

108.    The EDX Providers and the Rendering EDX Providers purport to conduct legitimate neurological examinations to determine the nature and extent of patients' neurological conditions.  However, these examinations were not legitimately performed, and virtually every examination concluded that EDX Tests were necessary when they were not and used the purported complaints, findings, and diagnoses to justify EDX Tests.

109.    Documentation of the neurological examinations consists of reports purportedly prepared and signed by the Rendering EDX Providers and submitted to the State Farm Companies ("Examination Reports").  While formatting varied slightly by provider and over time, the Examination Reports are form documents with each entities' name indicated in the header.  The Examination Reports for ENS Medical, Atlantic Medical, Northern Medical, and

Terrace Medical contain check boxes, fields that can be circled or checked, and blank spaces that can be completed with text. *See* Ex. 14. The Examination Reports from Queens Medical employ common headers and boilerplate language in narrative summaries. *See* Ex. 15. All of the Examination Reports are not credible and are fraudulent. The Examination Reports find: (a) patients complain of neck and/or back pain that often radiates to an extremity; (b) patients' symptoms are in multiple regions, such as both the left and right sides of the body and/or in both the upper and lower extremities; (c) patients often have weakness, pain, spasms, tenderness, numbness, and/or tingling; and/or (d) sensory examinations reveal decreased responses in the upper and lower extremities. *See, e.g.*, Exs. 14, 15.

110.  While the reports purport to identify sensory loss and use this finding to justify EDX Tests, they record the finding without any specificity, typically indicating only that sensory loss is present, a purported spinal level at which the sensory deficit exists, and sometimes the side of the body at which it can be found. For example, some reports regarding the sensory system identify decreased response to light touch and pin prick by circling a nerve distribution as abnormal and indicating the side from a list of options without any description of where there sensory loss has occurred. Thus, a report in which the Rendering EDX Provider circled "deltoid (C5-C6) nerve distribution" as experiencing sensory loss could mean a condition in the axillary nerve (a peripheral nerve) that feeds the medial deltoid muscle or sensory issues in the lateral shoulder, lateral upper arm, lateral forearm, lateral hand or thumb. Such lack of specificity renders it almost impossible to determine a specific diagnosis or which, if any, electrodiagnostic studies should be performed.

111.    The Examination Reports from ENS Medical, Atlantic Medical, Northern Medical, and Terrace Medical include preprinted language that can be circled and blank spaces that can be filled, which reads as follows:

> This is a _____ year old man/woman status post a recent motor vehicle accident.  His/her neurological examination is remarkable for **mild/moderate/severe** mechanical deficit of the **Cervical,** and **mild/ moderate/ severe** deficit of the **lumbar spine** and sensory deficit in the distributions of the right / left _____ dermatomes.

112.    Based on the formatting of this text, a conclusion that a patient suffers from at least some mechanical deficit in the cervical and/or lumbar spine and sensory deficit distributions to the dermatomes is essentially predetermined.  While the Examination Reports from Queens Medical do not contain this precise language, they also routinely note that patients were in motor vehicle accidents and suffer from motor and sensory deficits in the lumbar and cervical spine.

113.    Findings and patient complaints of neck, mid back, and/or low back pain; weakness, pain, tenderness, numbness, and/or tingling in the extremities; and the presence of such symptoms in more than one region of the body — on both the left and right sides and/or both the upper and lower regions — are not credible.  It is uncommon for patients to have this combination of symptoms, and virtually impossible that so many patients would have such conditions.  Nevertheless, by documenting such conditions, the EDX Providers and the Rendering EDX Providers use such findings to justify EDX Tests.  Moreover, while there are Examination Reports in which patients are found to have more limited conditions, such as only on the left or the right side of the body or in the upper or lower region, patients are treated the same regardless of their conditions or complaints and EDX Tests are recommended.

114.    Based on purported findings and patient complaints, the Examination Reports reflect diagnoses of cervical sprains/strains, thoracic sprains/strains, and/or lumbar or

lumbosacral sprains/strains and radiculopathies and establish a treatment plan that includes NCVs and EMGs. *See, e.g.*, *id*. Examination Reports for ENS Medical, Atlantic Medical, Northern Medical, and Terrace Medical include a pre-printed recommendations section stating: "Based on the description of the injury, the patient's complaints, current physical findings and working diagnosis the following recommendations are essential and medically necessary in order to stabilize and expedite recovery of his/her injuries[,]" providing a place to check and/or otherwise recommend either EMG/NCV of the upper extremities or EMG/NCV of the lower extremities or both. These Examination Reports also list a number of predetermined justifications for the EDX Test or simply state it is being ordered "to confirm Radiculopathy and rule out any potential neuropathy." Examination Reports for Queens Medical typically recommend the EDX Tests "to determine localization and extent of peripheral nerve root injury."

115. The Examination Reports predict that, despite testing and additional treatment, patients' conditions will continue. The Examination Reports for ENS Medical, Atlantic Medical, Northern Medical, and Terrace Medical provide a predetermined prognosis that is "[g]uarded but favorable with treatment," though the "possibility of this condition becoming permanent cannot be ruled out at this time." The prognosis includes a further purported justification for the EDX Test, stating with minor non-substantive variations that, based on "the slow progress in the patient's recovery despite physical therapy intervention, additional neurodiagnostic tests were ordered to determine the full extent of the injury and the results of the testing will provide necessary information for final decision regarding this patient's prognosis." The Examination Reports for Queens Medical state the deficits could "persist for an indefinite period of time affecting the patient's mobility and consequently the quality of . . . life." Such references could be used not only to justify the testing, but to support continued services from the Referring

Providers who made the referrals to the EDX Providers, thereby conferring another benefit on the Referring Providers as part of the apparent *quid pro quo* arrangements pursuant to which the EDX Providers and Rendering EDX Providers were able to examine and test patients.

116.   The Examination Reports conclude that there is a causal connection between the patients' symptoms and the motor vehicle accident.

## 2.   The EDX Tests

117.   Based on the neurological examinations, patients are subjected to medically unnecessary NCVs and EMGs.

### a.   The Fraudulent NCVs

118.   The EDX Providers have submitted to the State Farm Companies separate charges of several thousand dollars for the NCVs performed on each patient.  Thus, the EDX Providers have a direct financial incentive to test multiple motor and sensory nerves because the greater the number of nerves purportedly tested, the higher the cumulative charges.  The EDX Providers and Rendering EDX Providers performed NCVs on the same nerves and the same numerous number of nerves in order to bill a high amount for the tests, and ignored significant abnormalities reflected in the reports.

119.   First, the EDX Providers and the Rendering EDX Providers did not individually tailor the NCVs to patients' unique circumstances and needs.  Instead, the EDX Providers and the Rendering EDX Providers performed NCVs on the *same* upper and lower extremity sensory and motor nerves for nearly all patients.  To the extent there was variation in the nerves tested, additional nerves were added for upper extremity studies and lower extremity studies for nearly all patients tested after a certain point in time.  *See* Ex. 16.  Specifically, for upper extremity NCVs, the EDX Providers and the Rendering EDX Providers purported to test:  (a) the sensory fibers of the median, ulnar, and radial nerves, bilaterally; and (b) the motor fibers of the median

and ulnar nerves, bilaterally. *Id*. Similarly, for lower extremity NCVs, the EDX Providers and

the Rendering EDX Providers purported to test: (a) the sensory fibers of the sural and superficial

peroneal nerves, bilaterally; and (b) the motor fibers of the peroneal and tibial nerves, bilaterally.

*Id*. Since late 2020, the EDX Providers and Rendering EDX Providers have typically purported

to test the same nerves they routinely tested for each patient previously, but have added for upper

extremity NCVs, the sensory fibers of the dorsal cutaneous nerves, bilaterally, and for the lower

extremity NCVs the sensory fibers of the saphenous nerves, bilaterally. *See id*.

120.    Second, the EDX Providers and the Rendering EDX Providers not only tested the

same nerves on each NCV, but the number of nerves tested was to support a charge, not because

it was necessary to test them. Although the Recommended Policy provides that the maximum

number of NCVs that should be required to diagnose a radiculopathy in more than 90% of

patients are NCVs of three motor nerves and two sensory nerves, as discussed above, the EDX

Providers and the Rendering EDX Providers perform NCVs of more than three motor nerves and

two sensory nerves for virtually every patient. For patients who received EDX Tests for both

upper and lower extremities on the same date of service, the EDX Providers and the Rendering

EDX Providers performed NCVs on the same *eight* motor nerves (with F-wave studies) and the

same *ten* sensory nerves in virtually all such patients. Prior to the Fee Schedule change, for

patients who received EDX Tests for upper extremities only, the EDX Providers and the

Rendering EDX Providers performed NCVs on the same four motor nerves and the same six

sensory nerves, and for patients who received EDX Tests for their lower extremities only, the

EDX Providers and the Rendering EDX Providers virtually always performed NCVs on the same

four motor nerves and the same four sensory nerves. *See* Ex. 16. Since the Fee Schedule change

in October 2020, the EDX Providers and Rendering EDX Providers virtually stopped testing

patients' upper and lower extremities on the same date of service. As a result, the EDX Providers have typically increased the number of nerves tested on each date of service to ensure they can almost always bill for 11–12 NCV studies or 13+ NCV studies as the Fee Schedule allows. In a legitimate setting, the nature and number of nerves tested should be far fewer and should differ by patient based on each patient's unique circumstances.

121.    Additionally, patients are tested bilaterally regardless of whether they have bilateral symptoms, which substantially increases the charges from the EDX Providers. *See id.*

122.    Because the EDX Providers billed for NCVs based on the number of nerves tested, testing a significant number of nerves, and doing so bilaterally, enabled the EDX Providers to bill substantial amounts.

123.    Moreover, the EDX Providers and the Rendering EDX Providers failed to recognize and comment on NCV abnormalities that reflected substantial conditions. Among the unrecognized conditions were nerve conduction blocks of one or more major nerves, which should have been apparent from significantly lower motor amplitudes on proximal stimulation than on distal stimulation. Nerve conduction blocks are rare and most often associated with serious conditions such as Guillain-Barre syndrome, an autoimmune disorder preceded by a viral or bacterial infection that often results in profound muscle weakness and sometimes paralysis. Yet, despite the rarity and significance of nerve conduction blocks, their presence went unreported by the EDX Providers and the Rendering EDX Providers.

124.    Similarly, reports failed to note patients with significant asymmetry of the sensory amplitudes in which sensory amplitudes on left and right sides of the body differed by more than 50%. There are a variety of important conclusions that could be drawn from such asymmetry, yet the issue was not even recognized.

###### b.      The Fraudulent EMGs

125.    The EDX Providers and the Rendering EDX Providers' approach to EMGs also was not tailored to the unique circumstances and needs of any patient, was not based on medical necessity, and was designed to support charges rather than to legitimately diagnose and treat patients.

126.    Although the Recommended Policy provides that the ***maximum*** number of EMGs that should be required to diagnose a radiculopathy in more than 90% of patients are two-limb EMGs, the EDX Providers performed EMGs on all four limbs (either on a single date of service or over the course of two separate dates of service) on approximately 60% of their patients and did not, as a matter of course, perform EMGs on less than two limbs.  *See id.*  In a legitimate setting, four-limb EMGs should be a rare exception.  By separately billing for two limbs over the course of two separate dates of service, the EDX Providers sought to hide the fact that they were doing four limb EMGs, prevent payors from discovering that they were rendering unnecessary services and increase the likelihood that their unnecessary services would be reimbursed.

127.    The EDX Providers and the Rendering EDX Providers performed EMGs on multiple limbs even when such testing included limbs the EDX Providers' own Examination Reports reported were not symptomatic.  *See, e.g.*, Exs. 17, 18.  By testing all four limbs, the EDX Providers were able to charge $408.64 per EMG, rather than only $185.73 if one limb was tested.

###### c.      EDX Tests Produced Non-Credible Results

128.    In some instances in which the tests identified neurological conditions, the results were not meaningful or credible.

129.    First, in some instances, the EDX Providers and the Rendering EDX Providers purported to diagnose radiculopathies based solely on abnormalities in the paraspinal muscles.

But while abnormalities of the paraspinal muscles can be used to support such a diagnosis, without more it is not possible to diagnose effectively a patient with radiculopathy because it is impossible to localize the injury, which is critical if the result is to be meaningful for treatment. A diagnosis of a radiculopathy is based on a finding of abnormalities in multiple muscles supplied by the same nerve root. For example, a C6 radiculopathy may result in abnormalities in the C4, C5, C6, C7, and C8 paraspinal muscles because the nerve supply of the paraspinal muscles overlaps widely. After identifying such abnormalities, one should then use abnormalities in the limb muscles to localize the specific level of the injury. But the EDX Providers and the Rendering EDX Providers typically rely solely on paraspinal results, rendering the studies' radiculopathy diagnosis incapable of localizing the injury and useless.

130. Second, some reports purport to diagnose radiculopathy but ignore abnormalities that are inconsistent with radiculopathy. For example, as noted, reports indicate that patients may suffer conduction blocks or significant asymmetry of the sensory amplitudes, but the EDX Providers and the Rendering EDX Providers do not recognize or otherwise address these conditions, which would not be consistent with radiculopathy.

131. Third, some patients diagnosed with radiculopathy were found to have that condition based only on abnormal results for positive sharp waves and/or fibrillations (signs of denervation), indicating these patients had a radiculopathy of sufficient severity to cause the process of denervation to occur, even though many of these tests were conducted more than six weeks after the automobile accident. Further, some of these patients were found to show no signs of reinnervation (*e.g.*, abnormal motor unit potentials that can be seen during the EMG, including abnormal amplitudes, durations, polyphasia, and recruitment responses) even though

that process would normally have begun to occur at or about the time the denervation process had begun to occur.

132.    More generally, reports often reflected poor technical quality and errors.  For example, some reported motor amplitudes for one or more nerves that were higher proximally (nearest to the point of origin at the spine) than distally (furthest from the point of origin at the end of an extremity), which would be impossible.  In some reports F latencies and H reflex latencies were exactly the same to two decimal places, which would be highly unlikely statistically.  Some patients were reported to have extremely abnormal NCVs, but normal EMGs, despite the fact that this lack of correlation is hard to explain as patients do not have peripheral neuropathies reflected in NCVs with normal EMGs in their distal muscles.

### d.      EDX Tests Did Not Alter Treatment

133.    Diagnostic tests should only be performed if they can provide information that will be useful to a health care provider in diagnosing patients' conditions and in making decisions about how to direct patient care.  But, regardless of the results of the neurological examinations and EDX Tests performed by the EDX Providers and Rendering EDX Providers, patient treatment is not altered.

134.    Indeed, several patients testified that the results of the EDX Tests were never shared with them and did not alter or affect their subsequent treatment at the Clinics.  For example, patient N.J.F., who received an EDX Test from Atlantic Medical, testified that he was never told the results of the test and there were no changes to his treatment following the test. Another patient, L.H., received an EDX Test at ENS Medical and testified that his treatment did not "change at all as a result of the[] nerve testing results[.]"  Indeed, regardless of the EDX Test results, the Clinics, including the Referring Providers, did not alter the treatment provided to patients.

e.       **Defendants' Claims for EDX Tests and Examinations**

135.    Defendants submitted or caused to be submitted bills and supporting documentation for neurological examinations, NCVs, and EMGs to the State Farm Companies. These bills and supporting documentation are fraudulent because the exams and tests were not medically necessary, the pervasive patterns in the documentation are not credible, and they do not reflect legitimate exams, findings, testing, or diagnoses.

E.       **Legitimate Shockwave Therapy**

136.    Shockwave Therapy most commonly involves the use of a hand-held device to deliver waves of energy to injured areas of the body.  Under certain circumstances, it can promote healing and reduce pain.  These beneficial effects are thought to result from shockwaves stimulating blood flow circulation, promoting growth and modifications in targeted tissue, releasing neurotransmitters that help with pain, and acting on pain signals that communicate with the spinal cord to the brain.  There is also evidence that in certain circumstances these shockwaves may facilitate the healing of bone fractures.  For Shockwave Therapy to be effective and induce a therapeutic response, it must be targeted to the particular anatomical site of injury and create sufficient energy, and the treatment should be painful as there is evidence that the use of local anesthesia reduces effectiveness.

137.    The use of Shockwave Therapy to treat most musculoskeletal conditions has been classified as experimental and investigational.  Thus, the Centers for Medicare & Medicaid Services ("CMS") has published coverage guidance for Shockwave Therapy in which it considered the use of Shockwave Therapy for specific musculoskeletal conditions including tendinopathy of the shoulder or elbow, carpal tunnel syndrome, greater trochanteric pain syndrome, fractures and delate unions/nonunions, osteonecrosis of the femoral head, and patellar tendinopathy.  CMS concluded that further research was necessary to establish the efficacy and

safety of high energy Shockwave Therapy in the treatment of such conditions. As a result, it determined that such treatment was not reasonable and necessary for the treatment of musculoskeletal conditions and is therefore not covered. Moreover, Shockwave Therapy has not been approved by the U.S. Food and Drug Administration ("FDA") for the treatment of neck, back, knee, or shoulder pain.

138. Additionally, administering high energy Shockwave Therapy to patients with radiculopathy, which would involve sending high energy shockwaves generated through electrohydraulic and electromagnetic mechanisms, into the body of patients with pinched nerve roots, could be dangerous. Radial shockwaves creates pressure waves, and sending pressure waves over a site of an injured nerve root could also cause harm. Indeed, the International Society for Medical Shockwave Treatment ("ISMST") warns against the use of Shockwave Therapy to treat spine or disc issues with nerve-root involvement. As a result, Shockwave Therapy should generally not be administered to anatomical areas of nerve root injury in any patient diagnosed with or suspected to suffer from radiculopathy.

139. The two most common forms of Shockwave Therapy used in clinical practice are radial pressure wave therapy ("Radial Shockwave") and focused shockwave therapy ("Focused Shockwave"). Both involve devices placed on or over the patient's site of injury with applicator gel that send waves of energy into the patient. They differ in, among other things, how they generate the waves of energy, the types of waves they generate, and the amount of energy they produce.

140. Radial Shockwave generates pressure waves through compressed air used to fire a projectile within a tube to strike a metal applicator. The applicator is placed on the patient's skin, and the applicator delivers a pressure wave into the patient's body each time the projectile

strikes the applicator.  Radial Shockwaves spread out from that point of impact similar to the way in which waves spread in water away from the point a stone is dropped.  As a result the highest energy from Radial Shockwave is produced close to the point of contact and pressure waves tend to weaken the further they travel.  Radial Shockwave more reliably treats superficial conditions that do not require deep penetration into the tissue.

141.    Focused Shockwave generates shockwaves differently from Radial Shockwave. Most commonly, Focused Shockwave is produced through electrohydraulic mechanism (electric discharge within aqueous medium) or from electromagnetic devices (passing a high electric current through a coil).  Through a series of reflectors the resulting shockwaves can be focused, directed and targeted to a particular anatomical structure within a patient.  Unlike Radial Shockwaves, Focused Shockwaves do not typically weaken as they travel and generate the highest energy at the focused point.  As a result, Focused Shockwave can penetrate more deeply, at greater energy, into a location within tissue.  The focal point for Focused Shockwave can be 5 centimeters or greater within a patient.

142.    Given that Radial Shockwaves and Focused Shockwaves are generated differently, different equipment is used to administer each type of Shockwave Therapy. Equipment necessary to provide Focused Shockwave is considerably more expensive than equipment used to perform Radial Shockwave.  Part of the reason for the difference in costs is the higher amount of energy generated by Focused Shockwave devices.

143.    The FDA has recognized differences in each form of Shockwave Therapy and the devices used, and has determined that they create different levels of risk for harm to patients. Radial Shockwave devices are considered Class 1 devices involving the lowest level of risk, which the FDA defines as devices for which "[g]eneral controls are sufficient to provide

reasonable assurance of . . . safety and effectiveness," or, if there is insufficient information to determine if general controls can provide such assurances, then, among other things, the device "does not present a potential unreasonable risk of illness or injury." 21 C.F.R. § 860.3.  Focused Shockwave devices are considered to be higher risk — either as Class 2 devices, which are devices for which "general controls alone are insufficient to provide reasonable assurance of . . . safety and effectiveness and there is sufficient information to establish special controls," 21 C.F.R. § 860.3, or as Class 3 devices, which according to the FDA can "present[] a potential unreasonable risk of illness or injury[,]" 21 C.F.R. § 860.3.

144.    Relevant measurements during Shockwave Therapy, which should be recorded and documented during every procedure, include the amount of energy generated and the anatomical location targeted.  For Radial Shockwave, this includes the number of strikes or pulses applied to a given anatomical site per session and the amount of energy for each pressure wave.  Energy for Radial Shockwave can be measured in bars, a metric measure of pressure, with most treatments of musculoskeletal conditions involving 2 to 5 bars per pulse.  One bar of Radial Shockwave usually equals 0.04 to 0.05 millijoules ("mJ") of energy.  According to the ISMST and published literature on the use of Radial Shockwave for musculoskeletal conditions, a typical Radial Shockwave treatment should involve 1000 to 3000 pulses per anatomical site of injury per session.

145.    In contrast to Radial Shockwave, the energy generated from Focused Shockwave is commonly measured in millijoules (mJ).  Additionally, rather than reference the number of pulses, documentation of Focused Shockwave reports the number of shockwaves generated as "shocks."

146.    Before subjecting any patient to Shockwave Therapy, the patient must be individually evaluated and assessed to determine whether the patient has a specific condition for which such treatment might provide relief and whether the patient has reached the stage in their course of care that it is warranted.  The ISMST has published clinical recommendations regarding the use of Shockwave Therapy and, among other things, has stated in those recommendations that the minimum prerequisites for Shockwave Therapy include: (1) a clinical examination, (2) radiological imaging, and (3) potentially neurological and/or laboratory diagnostic testing and/or other investigations to corroborate the diagnosis.  At a minimum, the examination should include an individualized determination of the specific condition to be treated and the specific anatomical location to be targeted with shockwaves.

147.    If Shockwave Therapy is determined to be appropriate, the manner in which it is administered should be individualized to the particular needs of the patient.  The Shockwave Therapy should be administered to the injured region.  During each treatment session, the number of pulses or shocks applied at the site of injury and the amount of energy used per pulse or shock should be individually tailored to the patient's needs.  Higher energy more typically results in better treatment outcome.  Settings should often be adjusted during each treatment session and as treatment progresses, especially if lower energy settings are used early in the treatment session.  Shockwave Therapy should be painful and is most effective when local anesthesia and pain medications are not used, so patients should be subjected to the highest level of energy they can tolerate within the therapeutic range for their musculoskeletal condition.  Indeed, among the reasons energy per pulse should vary among patients is that patients have widely varying pain tolerances.  Moreover, Radial Shockwave and Focused Shockwave are different tools, and consideration should be given to whether the patient should be treated with

Radial Shockwaves, which spread widely, or Focused Shockwaves, which penetrate deeply to a focused point within tissue, or some combination of both Radial Shockwave and Focused Shockwave.  If only one device is available, either a Radial Shockwave device or a Focused Shockwave device, consideration must be given to whether the particular condition should be treated with the available device.

148.    Most musculoskeletal conditions require at least three sessions of treatment applied once per week, and full effects are observed 8–12 weeks after initiating treatment. Performing Shockwave Therapy on patients with musculoskeletal conditions once or only on a few sporadic occasions and/or spread out over an extended period of time (over weeks or months between treatment sessions) is unlikely to result in good treatment outcomes as it cannot promote the necessary response to result in healing or pain relief.  Furthermore, it is necessary to perform a thorough re-evaluation after an initial round of treatment sessions to determine whether the Shockwave Therapy has been effective before commencing additional rounds of treatment sessions.

149.    For treatment billed prior to October 1, 2020, the New York Fee Schedule established two codes for "extracorporeal shockwave involving the musculoskeletal system" — 0019T for low energy therapy and 0101T for high energy therapy.  On January 1, 2017, the 0019T code was deleted from the CPT manual and from the New York Fee Schedule, effective October 1, 2020.  As a result, under the current New York Fee Schedule, for treatment on and after October 1, 2020, there is no specific code for low energy therapy, while high energy therapy continues to be billable under 0101T.  In the absence of a specific code for low energy therapy, the New York Fee Schedule dictates that low energy therapy should be billed under CPT Code 20999 as an "[u]nlisted procedure, musculoskeletal system, general."  Under the New

York Fee Schedule, charges for CPT Code 20999 are "BR" or "by report," meaning that fees for such procedures must be justified by supplying "[p]ertinent information concerning the nature, extent, and need for the procedure or service, the time, the skill and the equipment necessary . . . to permit a sound evaluation" and by establishing "a relative value unit consistent in relativity with other relative value units shown" in the fee schedule.

150.    While the New York Fee Schedule does not define low energy therapy or high energy therapy, among proponents of Shockwave Therapy it is widely accepted that high energy Shockwave Therapy exceeds 0.28 mJ of energy per shockwave.  Radial Shockwave rarely can achieve these settings as 1 bar of air pressure may convert to 0.04 or 0.05 mJ of energy and most devices cannot exceed 5 bars of air pressure, limiting such devices to no more than 0.25 mJ of energy per shockwave.   For Radial Shockwave to generate over 0.28 mJ per shockwave would require application of over 6.2 bars per pulse.   But even if a device were capable of reaching this level of energy, Radial Shockwave is rarely administered at this level.  Indeed, because of the way in which Radial Shockwave pulses are delivered to the body this level of energy for Radial Shockwave would likely be beyond the pain tolerances of most patients.   Focused Shockwave is capable of delivering high energy Shockwave Therapy when administered with sufficient energy (*i.e.*, 0.28 mJ or higher). For these reasons, Radial Shockwave is generally classified and referred to as low energy Shockwave Therapy.

**F.    Fraudulent Charges for Shockwave Therapy and Examinations**

151.    Beginning in approximately October 2020, Defendants incorporated Shockwave Therapy into their scheme when East Coast Medical started providing medically unnecessary examinations and Shockwave Therapy.  In February 2021, Town Medical started providing medically unnecessary examinations and Shockwave Therapy and in May 2021, Garden Medical started providing medically unnecessary examinations and Shockwave Therapy.  In October

2022, Go Medical started providing medically unnecessary examinations and Shockwave Therapy.

### 1. Dr. Ahmed's Acquisition of Equipment Pursuant to Financial Relationships

152. Although East Coast Medical performs Shockwave Therapy at approximately 10 different locations, Dr. Ahmed has testified that it owned and used only one device, which is a Chattanooga Intelect Mobile 2 RPW. According to Dr. Ahmed, East Coast Medical purchased the device from Innovations Tech Group LLC ("Innovations Tech"), a company owned by Alex Buziashvili, and Innovations Tech either trained East Coast Medical's technicians or coordinated their training. Despite this relationship, East Coast Medical claims to have no agreements, communications, service logs, manuals, or training materials concerning the device or dealings with Buziashvili and Innovations Tech. Dr. Ahmed later testified that Garden Medical uses the same device as East Coast Medical. Dr. Ahmed also testified that the devices Go Medical uses for Shockwave Therapy were purchased from Innovations Tech, and these devices may also be the same devices used by the other Shockwave Therapy Providers.

153. Buziashvili is not a doctor and has been alleged to have illegally controlled physician practices and siphoned profits from those practices in the form of payments for the use of medical devices. In 2002, Buziashvili and his company, Parallel Management, were charged in connection with the Brooklyn District Attorney's Office's "Operation Gateway" investigation with, among other things, enterprise corruption, fraud, and falsifying business records, for illegally establishing and controlling no-fault medical practices in Brooklyn. Buziashvili and Parallel Management pleaded guilty to tax evasion and falsifying business records and paid a $750,000 fine.

154.    More recently, in 2020, GEICO filed a federal RICO lawsuit against Buziashvili, Innovations Tech, and others, alleging, among other things, that Buziashvili controlled and siphoned profits from Brownsville Chiropractic, an entity owned on paper by chiropractor John Paul Bucci.  The scheme involved Buziashvili and Innovations Tech leasing to Brownsville Chiropractic a Nervomatrix Soleve device used to perform Localized Intense Neurostimulation Therapy ("LINT") treatment.  Brownsville Chiropractic allegedly paid $13,000 per month to "rent" the Nervomatrix device although it only cost Buziashvili $5,000.  In addition, Buziashvili allegedly arranged for Brownsville Chiropractic to use Advanced Revenue Management, LLC as its billing company for LINT treatment for a fee of 10%.

155.    Buziashvili's Innovations Tech entered into a similar lease agreement with Progressive Medical Care PC ("Progressive Medical"), through which Progressive Medical agreed to pay Innovations Tech $13,000 per month for use of the Nervomatrix device for LINT treatment.

156.    While the details of the relationship between the Shockwave Therapy Providers, Dr. Ahmed, and Buziashvili and Innovations Tech are unknown, Dr. Ahmed admits to paying Buziashvili and Innovations Tech for the Shockwave Therapy device and for training. Additionally, records suggest closer ties associated with the Nervomatrix device that has been the subject of questionable arrangements.   For example, when East Coast Medical began to submit charges for Shockwave Therapy, it included documentation regarding the Nervomatrix device.  When asked why he submitted the Nervomatrix device documentation in claims for Shockwave Therapy, Dr. Ahmed claimed it was a mistake.

157.    If Buziashvili and/or Innovations Tech own and/or control any or all of the Shockwave Therapy Providers, then the Shockwave Therapy Providers' claims for services

would not be entitled to reimbursement and claims representing that they were entitled to reimbursement when they were not would be fraudulent

### 2.    Shockwave Therapy Examinations

158.    For each patient, the Shockwave Therapy Providers and the Rendering Shockwave Therapy Providers begin by purporting to conduct legitimate examinations to determine the nature and extent of patients' conditions.  However, these examinations are not legitimately performed, and every examination leads to a recommendation for and/or the performance of Shockwave Therapy.  Indeed, when East Coast Medical was asked to produce any document "reflecting any instance in which East Coast Medical examined a patient and determined that the patient did not need [shockwave therapy]," it responded that "[n]o such documents exist."  In an attempt to justify the absence of any instance in which examined patients were not subsequently treated, Dr. Ahmed claimed that some patients are not recommended for Shockwave Therapy, but that insurers would not know about them because East Coast Medical does not bill for examinations when Shockwave Therapy is not recommended.  But even if this non-credible claim were believed, it does not explain the complete absence of any records of these patient examinations.  It is inconceivable that every examined patient needed Shockwave Therapy and had reached the point in treatment at which they could benefit from such procedures.

159.    The Shockwave Therapy Providers routinely bill for examinations when none of the documentation submitted by them even remotely supports a charge for an examination.

160.    Over time, the Shockwave Therapy Providers used different forms to document their purported examinations of patients.  Regardless of the time period, or the form used, the documentation was not credible and reflected cursory examinations whose only purpose was to justify the performance and billing of Shockwave Therapy.  Initially, until approximately 2022,

the operative Shockwave Therapy Providers — East Coast Medical, Town Medical, and Garden Medical — and the Rendering Shockwave Therapy Providers typically used three forms: (1) "RPW Consult Forms," (2) "Treatment Plans," and (3) untitled forms Dr. Ahmed has described as "super-bills" ("Superbill"). Dr. Ahmed has testified that he created the forms. They contain check boxes, fields that can be circled or checked, and blank spaces that can be completed with text, and the RPW Consult Form contains boilerplate language in long narrative summaries. *See* Exs. 19 (RPW Consult Form for East Coast Medical, Town Medical, Garden Medical), 20 (Superbill for East Coast Medical, Town Medical, Garden Medical), and 21 (Treatment Plan for East Coast Medical, Town Medical, Garden Medical). Beginning in approximately 2022, the then operative Shockwave Therapy Providers — Go Medical, Garden Medical, and East Coast Medical — typically used a slightly different but similar set of forms: (1) "Radial Pressure Wave Therapy Initial Evaluation Forms" ("RPW Evaluation Forms"), (2) "ESWT Therapy Notes" ("ESWT Notes"), and (3) "Radial Pressure Wave Therapy Superbills" ("RPW Superbills"). *See* Exs. 22 (RPW Evaluation Form for Go Medical, Garden Medical, East Coast Medical), 23 (ESWT Note for Go Medical, Garden Medical, East Coast Medical), and 24 (RPW Superbill for Go Medical, Garden Medical, East Coast Medical).

161.    All of the forms used by the Shockwave Therapy Providers contain check boxes, fields that can be circled or checked, and blank spaces that can be completed with text, and boilerplate language. They all purport to note complaints, examination findings, and indications for Shockwave Therapy for each patient, but they reflect cursory examinations for each and every patient.

### a.    Pre-2022 Examination Documentation

162.    Form documents used by the Shockwave Therapy Providers are not credible and are fraudulent. The RPW Consult Forms record only three purported individualized findings for

each patient with check boxes to note the presence of: (1) "Tenderness to palpation and/or decreased ROM" in a particular spinal region or extremity; (2) "Paraspinal Muscle Spasms"; and (3) "Extremity Muscle Spasms."  Most patients are reported to have tenderness "and/or" decreased range of motion in at least one and often two or more regions of the spine and sometimes extremity and muscle spasms.  According to Dr. Ahmed, evaluations to identify paraspinal and extremity muscles spasms "are the two evaluations that are relevant to this consult."  But the measurements and purported conclusions drawn from them make no sense. Tenderness and decreased range of motion ("ROM") are different conditions, and specificity as to the amount of range-of-motion loss is important.  It is impossible to know which of these two conditions patients have (tenderness *or* decreased ROM) and, if they have reduced range of motion, the extent of those reductions.  Moreover, the barely minimal recorded findings are far from the only relevant information that should be gathered during a patient examination to determine whether a patient would benefit from Shockwave Therapy and, if so, where and how to apply it.

163.    The RPW Consult Forms also contain pre-printed, long narratives that purport to further document patient complaints and indications for Shockwave Therapy.  Dr. Ahmed has conceded that these sections are "boilerplate information" and contain "the same language verbatim in each . . . section[.]"  The "Pre-Procedure Evaluation" Section for ***each and every*** patient contains the following language:

Pre-Procedure Evaluation:

Based on the objective findings today, active, and ***passive ROM is decreased moderately, and palpation findings indicate mild to moderate pain and patient reports 7/10 pain level in VAS and difficulty with ADLS of moderately [sic] severity.***  [Emphasis added.]  Based on these findings and the review of the

73

available medical records, it is appropriate for this patient to proceed with initial RPW therapy.[2]

Thus, every RPW Consult Form documents the identical "objective findings," including identical pain scores of seven out of ten, moderately decreased range of motion, palpation findings and difficulty of "moderate[] severity" with activities of daily living. The reports then universally conclude that patients should proceed with Shockwave Therapy. These findings and conclusions are consistent with Dr. Ahmed's testimony that Shockwave Therapy is indicated for patients with moderately decreased range of motion and/or tenderness to palpation, and mild to moderate pain, which should be "at least seven." But there is no indication that pain scores were even obtained from individual patients, that patients routinely reported such high pain scores which would reflect extreme, life-disrupting pain, or that any individual patient was asked about activities of daily living. And even if they were, it is highly unlikely that virtually every patient experienced precisely this combination of conditions.

164.    Similarly, a pre-printed "Indications" Section in the RPW Consult Form for each and every patient states:

Indication:

Due to complaints of persistent pain following injuries sustained in an accident, the above-said patient was referred for Therapeutic Radial Pressure Wave (RPW) therapy. Based on the consultation, review of the patient's history and available medical records (see attached), patient's recovery is still at considerably less than Maximum Medical Improvement (MMI). On examination today, there remains a significant decrease in tested active and passive range of motion, significant end-range pain, various mal-alignments, myofascial tenderness, hypertonicity, trigger points and pain to palpation. The patient's VAS and pain diagram show the indication for the RPW procedure being don e [*sic*] today. Considering that this patient is not a surgical candidate yet, patient has not achieved MMI from other aggressive and/or conservative treatment modalities, there is no other

---

[2] The only difference in the "Pre-Procedure Evaluation" language across the three Shockwave Therapy Providers' RPW Consult Forms is that Garden Medical's forms state "patient reports *at least a* 7/10 pain level" in every instance. (Emphasis added).

conservative medical intervention, other than RPW at this point in time to correct mal-alignments, joint stiffness, subluxation, fibrous adhesions and/or calcifications, it is appropriate to proceed with a series of one to three therapeutic Radial Pressure Wave Shockwave therapy . . . .

Thus, the RPW Consult Forms contain a pre-written statement that patients have persistent pain following an automobile accident, have not reached Maximum Medical Improvement through other aggressive and conservative treatment, have significant decreases in range of motion, significant end-range pain, "various mal-alignments, myofascial tenderness, hypertonicity, trigger points and pain to palpation . . . joint stiffness, subluxation, fibrous adhesions and/or calcifications," and are not candidates for surgery. But there is no indication patients have these conditions or that anything has been done to determine if they do, and it is inconceivable that every patient would suffer from every one of these conditions. Indeed, fibrous adhesions (scar tissue) or calcifications are chronic conditions that develop over a long period of time and not enough time has passed for many of the patients to have developed these conditions. Malalignments and subluxations cannot even be treated with Shockwave Therapy. It is unlikely that any one patient suffered from all of the conditions listed in the RPW Consult Forms and inconceivable that virtually every patient suffered from the same combination of conditions.

165. Based on the purported complaints and findings reflected in the RPW Consult Forms, the Shockwave Therapy Providers and the Rendering Shockwave Therapy Providers typically diagnosed patients with undefined neck pain (sometimes identified as "Cervicalgia"), mid back and/or low back pain, and muscle spasms. The RPW Consult Forms provide a preprinted plan in which the only option was "Radial pressure wave therapy to the above affected areas" with an electronic checkmark preprinted next to it. They also included a certification that the "above RPW/Shockwave Treatment plan as [*sic*] medically necessary and approved by me." *Id*. Sometimes the certification was signed by a "NP/PA" employed by the

Shockwave Therapy Providers, and sometimes by a "surgeon" or physician.  When the RPW Consult Forms were submitted for East Coast Medical and Garden Medical the certifications were made by Dr. Ahmed, and when the RPW Consult Forms were submitted for Town Medical the certifications were made by Dr. Gelb.

<b>b.      Examination Forms Used From 2022 to the Present</b>

166.    Beginning in approximately 2022, the Shockwave Therapy Providers operating at the time began to use different, though similar, form documentation to report purported examinations of patients.  Like the prior documentation, these forms are not credible and are fraudulent.

167.    Like the RPW Consult Forms, the RPW Evaluation Forms purport to note complaints, examination findings, and indications for Shockwave Therapy for each patient, but they reflect only cursory examinations for each and every patient.  The form contains a largely preprinted section noting the patient was in an accident that is largely devoid of any details about the accident and appears to be used primarily to connect the accident to the purported injury. The form contains a list of body parts (e.g., "Head/Face," "Neck," "Upper back," "Mid back," "Lower back," "Shoulder (Right/Left/Both)," "Knee (Right/Left/Both)") that can be marked to indicate a site of injury.  The physical exam portion of the RPW Evaluation Form contains entirely preprinted descriptions of the purported examination of the patient's chest, abdomen, "[h]igher integrative function," "[m]otor atrophy," "[m]uscle tone," and head, eyes, ears, nose, and throat — the results of which are preprinted as normal.

168.    The RPW Evaluation Forms also purport to document whether the patient has tenderness, pain, spasm and/or decreased ROM in the cervical, thoracic and lumbar spine, paraspinal structures and/or shoulders, hips, and knees, and for virtually every patient, identify such conditions in at least two regions.  When the RPW Evaluation Forms note decreased ROM,

in some instances the degree of reduction is not even indicated and references to pain in the cervical or lumbar region fail to specify the level, type or location.  For some patients, exam findings are internally inconsistent, noting (1) pain, tenderness, and/or decreased ROM in the cervical and/or lumbar spine, yet reporting  "[n]ormal examination of the" cervical and/or lumbar spine; and (2) tenderness and spasms in the thoracic spine, yet reporting "[t]here is no tenderness or pain on palpation."

169.    Exam findings, which are referred to as "Diagnostic Impression[s]," are largely irrelevant.  The Diagnostic Impression section of the form contains a preprinted list, consisting of "Cervicalgia," "Thoracic pain," "Lumbar pain," "Right Shoulder pain," "Left Shoulder pain," "Right Knee pain," "Left Knee pain," and "Other," from which the Rendering Shockwave Provider typically circles two or more.  These "Diagnostic Impressions" are so generic and non-specific as to be essentially useless in formulating a treatment plan that might involve Shockwave Therapy.

170.    The RPW Evaluation Forms conclude with a preprinted plan for Shockwave Therapy and provide that "[t]he patient has ( ) agreed ( ) not agreed to do the Radial Pressure Wave therapy today for treatment, which will be applied to one to two areas per weekly sessions, for a period of six weeks.  The D20 transmitter will be gently applied to the below marked treatment areas starting at a frequency of 4-18Hz, low energy bars of 1-3.5 bar, and impulses starting at 500 impulses per spot."  The "treatment areas" referred to in the plan consist of a preprinted list of general areas of the body — "Cervical Spine," "Thoracic Spine," "Lumbar Spine," "Right Shoulder," "Left Shoulder," "Right Knee," "Left Knee," and "Other."  Typically, two or more of those general, non-specific body parts are circled by the Rendering Shockwave Therapy Provider.

171.    The preprinted plan contained in the RPW Evaluation Form also includes the following non-individualized statement: the "[p]atient will follow up in 1 week[,]" and without any explanation, that the "[p]atient was advised to continue physical therapy sessions, chiropractic treatment, as well as to continue taking pain medication as recommended by the medical facility Doctor."  Such a recommendation is included to ensure the patients continue to treat at the Clinic where the Shockwave Therapy Providers and/or Dr. Ahmed have improper financial arrangements.

### 3.    Fraudulent Shockwave Therapy

172.    Based on the recommendations from the Shockwave Therapy Providers and the Rendering Shockwave Therapy Providers, patients are subjected to medically unnecessary Shockwave Therapy by the Shockwave Therapy Providers and Rendering Shockwave Therapy Providers.

173.    The Shockwave Therapy Providers and Rendering Shockwave Therapy Providers provide Radial Shockwave.  The Shockwave Therapy Providers' documentation refers to the provision of "Radial Pressure Wave Therapy" and reports the energy delivered in bars, a measurement used for Radial Shockwave.  Additionally, Dr. Ahmed has testified that his entities perform Radial Shockwave, and the type of device used by at least East Coast Medical, Garden Medical, and Go Medical is only capable of delivering Radial Shockwave.

174.    As stated above, Radial Shockwave generates pressure waves that spread widely, have maximal energy close to the point of contact with the body, and cannot reliably generate high energy shockwaves to deep anatomical locations.  As a result, Radial Shockwave is often used to treat superficial conditions that do not required a high degree of energy deep within the body. Treatment should be directed to a specific identified condition, applied to a specific site of injury with consideration given as to whether the type of shockwaves are appropriate for a

particular patient's needs, administered with sufficient energy to produce a response, and delivered over a number of coordinated sessions within a limited period of time so that they can have beneficial effect.  When properly applied, Radial Shockwave treatment is painful.

175.    The Radial Shockwave provided by the Shockwave Therapy Providers and Rendering Shockwave Therapy Providers did not conform to any of these requirements and was unlikely to benefit patients, was improperly performed, and was improperly billed.

176.    It is impossible to know whether any patient had a condition that could have benefited from Shockwave Therapy, and if so where and how the Shockwave Therapy should have been administered.  The purported examinations and the Shockwave Therapy Providers' documentation purport to identify conditions, generalized diagnoses and/or pain for every patient, but it is unlikely that any one of these patients suffered from all of these conditions and diagnoses, and pain, and it is inconceivable that virtually every patient suffered from all of them. But even if patients suffered from one or more of the listed conditions there is no indication as to which condition they had or the specific site of injury sufficient to permit a determination as to whether the patient could benefit from Shockwave Therapy, should be administered Radial Shockwave or Focused Shockwave, where the shockwaves should be applied, the number of pulses and energy that should be used for each individual patient, or an individualized course of treatment specific to each patient that should be followed.  Significantly, at least some patients subjected to Shockwave Therapy by the Shockwave Therapy Providers and the Rendering Shockwave Therapy Providers are diagnosed with radiculopathy by other providers — including the EDX Providers and the Rendering EDX Providers themselves — prior to receiving Shockwave Therapy from the Shockwave Therapy Providers and the Rendering Shockwave

Therapy Providers.  In such instances, Shockwave Therapy applied to spinal areas of nerve root injury would not only be contra-indicated, but could be dangerous and exacerbate injuries.

177.    Even if patients had conditions that could benefit from Radial Shockwave, the Shockwave Therapy Providers and the Rendering Shockwave Therapy Providers did not perform it properly.   Documentation used beginning in approximately 2022 failed to include critical information about the number of pulses and energy delivered to any patient.  *See* Ex. 23. Without such information it is impossible to know whether the treatment was individualized, appropriately rendered or could have provided any benefit, or for the Shockwave Therapy Providers or any health care professional to make a fully informed judgment about subsequent care.

178.    When documentation did reflect pulses and energy, as it generally did until 2022, it reflected that the Shockwave Therapy Providers and Rendering Shockwave Therapy Providers virtually always delivered Shockwave Therapy in the same manner — typically administering 2000 pulses per session, with between 1 to 1.5 bars of energy per pulse, to one or more regions per session, in limited sessions and/or a few sessions spread out over time, *see* Ex. 25 (sample survey of shockwave patients), with a vague, generic description of the "Areas Treated."

179.    There are several problems with this approach.  The number of pulses per region and energy delivered should have been individualized for each patient.   While even the Shockwave Therapy Providers' forms acknowledge a range of possible pulses (RPW Consult Form: "500 per area, 1000–2000 progressive or larger area"; RPW Evaluation Form: "impulses starting at 500 impulses per spot") and energy (RPW Consult Form: "Energy: 1.1–3.5 for many conditions"; RPW Evaluation Form: "low energy bars of 1-3.5 bar"), when the number of pulses and energy delivered *were actually documented*, the Shockwave Therapy Providers' forms

reflect the Rendering Shockwave Therapy Providers almost always applied at most 2000 pulses per session and almost never more than 1.5 bars per pulse, without regard to the individual needs of patients. Indeed, Dr. Ahmed expressed indifference to the amount of energy necessary, misstating its importance and testifying: "if the patient is a larger person, you may need to apply a higher pressure, obviously, I guess to affect the deeper tissues. There is no real science behind it."

180.    The Radial Shockwaves were also administered in a way in which they could not possibly have provided any benefit. Shockwave Therapy usually involves at least 2000 pulses per session to treat a single musculoskeletal condition, yet when the number of pulses delivered was documented, the documentation reflects the Shockwave Therapy Providers and the Rendering Shockwave Therapy Providers often provided 2000 pulses to treat multiple regions in each session. Additionally, remaining at or below 1.5 bars of energy with every pulse meant a level of energy delivered was so low as to be effectively useless, particularly when coupled with the limited number of pulses per site of purported injury. Such a low level of energy was almost certainly selected because it would not have been painful, and the Shockwave Therapy Providers were likely concerned that painful treatment could have discouraged patients from returning for additional treatment for which they could bill. Indeed, the RPW Evaluation Forms specifically note that the "D20 Transmitter [for the Shockwave Therapy device] will be gently applied to the . . . treatment areas" and "low energy" Shockwave Therapy will be supplied. Ex. 22. For Shockwave Therapy to be effective it must generally be administered at the highest level that patients can tolerate without local anesthesia or pain medications.

181.    There is no indication that the Shockwave Therapy Providers and the Rendering Shockwave Therapy Providers delivered shockwaves to the site of any injury. The

documentation reflects application of Shockwave Therapy to generic non-descript locations. Until 2022, documentation provided vague and generic descriptions of the "Areas Treated," such as "Cervicalgia," or "Low Back Pain" or "Cervical," Thoracic" or "Lumbar." Exs. 19, 21. Beginning in 2022, documentation identified the area treated broadly as "Cervical spine regions muscular pain," "Thoracic spine regions muscular pain," or "Lumbar spine regions muscular pain," and then "Left" and/or "Right" sides of the following general body parts: "Shoulder," "Elbow," "Ankle," "Lower leg," "Upper leg," "Feet," "Knee," "Wrist," and "Hip." Ex. 23. But these references do not actually identify a specific site of injury.

182.    Nor is there any indication that the Shockwave Therapy Providers and the Rendering Shockwave Therapy Providers considered whether Radial Shockwave, as opposed to Focused Shockwave, or some combination of Radial and Focused Shockwave, was appropriate for their patients.  As they appear to have only had access to a Radial Shockwave device and only used Radial Shockwave, they could have only treated superficial conditions that benefit from waves that spread widely.  But there is no indication of what conditions they treated or where specifically such conditions were located.

183.    Additionally, the Shockwave Therapy Providers and the Rendering Shockwave Therapy Providers did not provide treatment through coordinated treatment sessions over a limited time.  While many patients previously received Shockwave Therapy from other providers at the Clinics prior to receiving it from the Shockwave Therapy Providers and the Rendering Shockwave Therapy Providers, at no time did the Shockwave Therapy Providers or the Rendering Shockwave Therapy Providers mention such prior treatment, much less discuss how it could impact current treatment.  Many patients of the Shockwave Therapy Providers have only one or two sessions.  *See* Ex. 2.  But Shockwave Therapy should not be performed for only one

82

or two sessions when treating most musculoskeletal conditions.  None of the documentation indicates that any patient could not tolerate the procedure, so there is no explanation for why these patients received so few sessions of treatment.  Those patients that underwent more sessions often had long lapses of time between sessions.  *See* Ex. 25 (sample survey of shockwave patients).  Indeed, some sessions are weeks and even up to multiple months apart.  In fact, the RPW Consult Forms and Treatment Forms contain preprinted selections for the number of treatments patient should receive, in the following increments: "0–1 times," "1–2 times," "2–3 times," "3–4 times," and "4–5 times."  But this predetermined plan incorrectly suggests that limited treatments can be beneficial and does not set forth the critically necessary coordinated series of treatment sessions over a limited period of time.  Documentation used beginning in 2022 similarly reflected pre-determined care that was not individualized as it contained pre-printed treatment plans for Shockwave Therapy "to one or two areas per weekly sessions, for a period of six weeks[,]." But the Shockwave Therapy Providers did not even follow this plan as the vast majority of patients had only one date of service or treatment on multiple dates spread over weeks or even months.  Rendering treatment in this manner could not possibly have prompted beneficial responses in patients.

184.    In most instances, the Shockwave Therapy Providers and the Rendering Shockwave Therapy Providers performed Shockwave Therapy on multiple regions during each session.  It is unlikely that so many patients would have had conditions in multiple regions that required Shockwave Therapy and had reached the course of care with respect to each region that required Shockwave Therapy when it was provided.  Moreover, when the number of pulses delivered per session is documented, the number of pulses delivered (*i.e.*, typically 2000) was consistent with what should typically be delivered for one site of injury, even though in most

instances Shockwave Therapy was performed on multiple regions per session.  Thus, patients likely received few pulses per purported site of injury, further reducing the clinical beneficial effects of Shockwave Therapy.

185.    There is no reliable indication that any patient improves from the Shockwave Therapy.   Beginning in approximately 2022, documentation says only that "[t]he patient tolerated the therapy well" and "[t]here were no complications during the therapy."  Ex. 24. According to the RPW Consult Forms, which were used until approximately 2022, virtually every Shockwave Therapy procedure, which is described as "nothing short of wonderful," is a success.   The RPW Consult Form appears to acknowledge that a re-evaluation is necessary to determine if the procedure provided a benefit, stating in preprinted language that the patient will be "re-evaluated in 5-7 days following the procedure" to "determine the effectiveness of the RPW and to assess for delayed side effects" and then decide "whether to continue with the subsequent weekly treatments and determined [*sic*] the optimal total number of visits required for this patient."  Ex. 19.  But despite this acknowledged need for a subsequent re-evaluation, the preprinted RPW Consult Form claims that "Radial Pressure Wave treatment was performed with the expected outcomes of decreased pain and stiffness, decreased inflammation, and increased mobility."  Elsewhere it declares:

> The patient tolerated the procedure well; there were no intra-procedure or post-procedure complications. . . . The patient was able to achieve increased motion post-RPW.  The patient also showed decrease in trigger points and muscle spasm. With the improvement of range of motion it is medically reasonable to conclude that this patient's fibro-adhesive conditions were significantly impacted; increasing the potential for appropriate neuromuscular re-education of affected myofascial structures and before having reestablishment of collagen deposition during the healing phase.

But patients are unlikely to all have experienced improvement, let alone this level of benefit, immediately after the procedure.  In fact, if properly administered, patients should have found

Radial Shockwave treatment painful, and the full benefit, if any, is unlikely to be observed until 8 to 12 weeks after initiating the treatment sessions.  Moreover, it is unlikely that every patient had these conditions and responded in exactly the same way.  The claim that some undefined improvement in the patient's range of motion means that the patient's "fibro-adhesive conditions were significantly impacted" makes little sense, because the patients are unlikely to have had fibrous adhesions (scar tissue formed over time) related to the motor vehicle accident in the first instance.

186.    Furthermore, these reported responses all but acknowledge the complete lack of coordinated treatment sessions over a limited period of time.  According to the RPW Consult Forms, the Shockwave Therapy Providers and the Rendering Shockwave Therapy Providers indicate that they will examine patients in "5-7 days," determine how the patient responded and decide whether to go forward with another session.  But patients cannot legitimately improve until sometime after completion of a full regimen of coordinate treatment sessions, and decisions about when and how to administer Shockwave Therapy should be made in formulating a coordinated treatment plan, not based solely on how the patient purportedly responds after each session.

187.    Even if the Shockwave Therapy Providers' and the Rendering Shockwave Therapy Providers' approach is accepted, their evaluations were not legitimate and always led to recommendations for and/or the performance of Shockwave Therapy.  As a result, any patient who does return for an evaluation will be subjected to additional Shockwave Therapy regardless of whether it will provide a benefit.  Ultimately, patients stop getting Shockwave Therapy not because the Shockwave Therapy Providers and the Rendering Shockwave Therapy Providers

determine that no additional treatment is necessary, but likely because the patients unilaterally stop showing up for treatment.

188.    In addition to the fraudulent manner in which Shockwave Therapy was provided, it was improperly billed.  All procedures were billed using CPT Code 0101T which represents that the Shockwave Therapy Providers and the Rendering Shockwave Therapy Providers were providing high energy therapy.  *See* Ex. 26.  But the Shockwave Therapy Providers and the Rendering Shockwave Therapy Providers always provided Radial Shockwave and almost never administered more than 1.5 bars per pulse, or no more than at best 0.075 mJs of energy.  *See, e.g.*, Ex. 25 (sample survey of shockwave patients).  Thus, the Radial Shockwave purportedly provided, particularly at such low energy levels so far below the 0.28 mJs of energy widely accepted to constitute high energy therapy, is low energy Shockwave Therapy.  As such, it should have been billed under CPT Code 20999 as an "[u]nlisted procedure, musculoskeletal system, general" and accompanied by a report supplying "[p]ertinent information concerning the nature, extent, and need for the procedure or service, the time, the skill and the equipment necessary . . . to permit a sound evaluation" and establishing "a relative value unit consistent in relatively with other relative value units shown" in the fee schedule.

## G.    Defendants' Claims for Shockwave Therapy

189.    Defendants submitted or caused to be submitted bills and supporting documentation for examinations and Shockwave Therapy to the State Farm Companies.  These bills and supporting documentation are fraudulent because the examinations and Shockwave Therapy were either not performed or were not medically necessary, the bills misrepresented that high energy shockwave therapy was performed when, in fact, low energy shockwave therapy was performed, and the documentation is not credible and does not reflect legitimate exams, findings, diagnoses, or treatment.

### H. ENS Medical, Atlantic Medical, Queens Medical, East Coast Medical, Town Medical, and Garden Medical Failed to Verify Their Claims to the State Farm Companies

190.    To verify some of the claims they received, the State Farm Companies requested, on multiple occasions, EUOs and/or documents from ENS Medical, Atlantic Medical, Queens Medical, East Coast Medical, Town Medical, and Garden Medical.  Each request was timely made and based upon the application of objective standards justifying the information and documentation sought by the State Farm Companies, including seeking relevant documentation. The State Farm Companies had, and continue to have, a reasonable basis to request additional verification from ENS Medical, Atlantic Medical, Queens Medical, East Coast Medical, Town Medical, and Garden Medical pursuant to 11 N.Y.C.R.R. § 65-3.16(a)(12) and New York Insurance Law § 5102(a)(1).

191.    The failure or refusal to provide additional verification constitutes a material breach of the State Farm Companies' insurance policies and the No-Fault Laws under which the claims have been made and, as such, relieves the State Farm Companies from any obligation to pay Defendants on any of the claims.

192.    In each instance where Defendants refused to provide proper verification, the State Farm Companies issued a timely denial on the prescribed NF-10 form stating, in relevant part, that Defendants failed to comply with their obligations to present proper proofs of claim and that their claims were denied because they failed to satisfy a condition of coverage.

193.    All of the State Farm Companies' denials of the bills and charges submitted by ENS Medical, Atlantic Medical, Queens Medical, East Coast Medical, Town Medical, and Garden Medical were timely, proper, and consistent with the No-Fault Laws.

194.    In fact, in or about September 2018, Queens Medical, in an effort to prevent the State Farm Companies from obtaining verification of its claims, and to further the fraudulent

scheme and prevent its discovery, began to submit claims using a different tax identification number ("TIN").  Queens Medical's use of this different TIN had its intended effect, and the State Farm Companies did not initially discover that these new claims under the new TIN required verification and paid them.  After the State Farm Companies learned of Queens Medical's new TIN, new entities owned by Dr. Ahmed — Terrace Medical, Boulevard Medical, Pegasus Medical, and Parkside Medical — began billing for the same services as the other EDX Providers.  The use of Terrace Medical, Boulevard Medical, Pegasus Medical, Parkside Medical, and a new TIN by Queens Medical not only constituted affirmative acts to conceal the fraud, but also is further evidence of Dr. Ahmed's and the EDX Providers' knowledge of the fraudulent nature of their claims.

195.    Dr. Ahmed has engaged in similar activity with respect to the Shockwave Therapy Providers.  In January 2021, the State Farm Companies sought verification of East Coast Medical's claims for examinations and Shockwave Therapy.  The very next month, Town Medical began submitting bills for the same services, but tried to hide Dr. Ahmed's ownership by misrepresenting that Dr. Gelb owned Town Medical when at all times it has been owned by Dr. Ahmed.  The State Farm Companies did not initially discover Town Medical's common ownership and activity, and Town Medical's bills were paid.  Thereafter, when the State Farm Companies began to seek verification of Town Medical's claims, Dr. Ahmed changed course again and a new entity owned by him — Garden Medical — began billing for the same services. Again, the State Farm Companies did not initially discover Garden Medical's common ownership and activity and Garden Medical's bills were paid.  The State Farm Companies subsequently sought verification of Garden Medical's claims.  After that, in July 2022, Garden Medical and East Coast Medical began submitting new claims with different documentation.  In

October 2022, another entity owned by Dr. Ahmed, Go Medical, began billing for the same services. The use of (1) Town Medical, Garden Medical, and Go Medical, (2) the misrepresentation that Dr. Gelb owns Town Medical when in fact Dr. Ahmed does, and (3) the use of new documentation beginning in 2022 for East Coast Medical and Garden Medical constitute further affirmative acts to conceal the fraud, and are further evidence of Dr. Ahmed's, Dr. Gelb's, and the Shockwave Therapy Providers' knowledge of the fraudulent nature of their claims.

## I.    Other Medically Unnecessary Services Rendered by Dr. Ahmed

196.    Dr. Ahmed is an opportunist more interested in profit than patient care. As a result, he performs services not because he wants to improve patients' conditions, but because he sees an opportunity to bill. Having profited from EDX testing and Shockwave Therapy, Dr. Ahmed found yet another way to take advantage of patients through TCD testing and vestibular testing. As with each of the services he and his entities perform, TCD testing and vestibular testing are not necessary and are not performed in a manner in which they can provide any benefit.

### 1.    TCD Testing

197.    TCD testing involves the use of ultrasound testing to evaluate blood flow in the arteries of the brain. It employs Doppler ultrasound, which cannot generate anatomic images but can determine the speed of blood moving through arteries and veins. Increases in the velocity of blood flow can reflect narrowing of blood vessels, an indicator of potentially serious health conditions requiring attention. TCD testing is most often used to monitor previously diagnosed conditions. It has value to address a limited number of very specific conditions that depend on determining whether there has been a narrowing of blood vessels. Legitimate uses would include:

- Monitoring subarachnoid hemorrhage induced vasospasm:  Vasospasm is a serious life-threatening condition caused by a brain aneurysm in which arterial blood ruptures from the aneurysm into the space (subarachnoid space) surrounding the brain.  About half of the patients who suffer a brain aneurysm die before making it to a hospital.  For those who do get to a hospital, evaluation might include TCD testing.  Such patients are typically critical ill in an intensive care unit of a hospital ("ICU") and exhibiting obvious signs and symptoms of intracranial bleeding;

- Monitoring blood flow in children with sickle cell anemia:  Sickle cell anemia is an inherited blood disorder that can lead to narrowing of the major intracranial blood vessels and result in strokes in children and adolescents.  TCD testing can be used to monitor blood flow to assess the need for  blood transfusions for such individuals;

- Monitoring transient ischemic attack ("TIA") or stroke patients:  Among the less common causes of stroke are narrowing and occlusion of the medium sized intracranial blood vessels.  TCD testing can be used to monitor these patients who are at risk for TIAs or stroke.

198.    In addition to a "complete" TCD study (billed under CPT Code 93886), TCD testing can sometimes involve two other specific studies — a vasoreactivity study (billed under CPT Code 93890) and emboli detection (billed under CPT Code 93892).  In a legitimate setting, a vasoreactivity study is an extremely rare procedure to determine whether an extremely rare surgery (encephalo-duro-synangiosis) is needed.  In particular, doctors may consider addressing severe narrowing of an intracranial blood vessel with a neurosurgical bypass to reduce the

chance of further TIA or stroke.  Before performing such a procedure, it is absolutely necessary to determine if arteries are already performing at their maximum level and can do no more without intervention.  When diseased arteries narrow, other arteries dilate in an attempt to maintain an adequate blood supply.  They continue to do so until they reach maximum dilatation. A vasoreactivity study can determine if the patients' cerebral arteries are at maximum dilation, that is, have reached the point where a neurosurgical bypass is indicated.

199.    Emboli detection involves looking for emboli or small clots that may be traveling in the blood stream to the brain for a subset of patients who are at risk of stroke from such emboli or clots.  Most clots in most patients occur in the venous system and are filtered out in the lungs. However, a small subset of patients are born with a condition that could, under certain circumstances, allow these clots to bypass the lungs, travel to the brain and cause a stroke.  The condition, known as patent foramen ovale ("PFO") involves a hole between the right and left chambers of the heart through which clots can bypass the lungs and travel to the brain.  Patients with PFO, especially large PFO, are at higher risk of clots making their way to the brain or "paradoxical emboli" (*i.e.*, a blood clot that travels from the venous to arterial circulation). Strokes due to paradoxical emboli and PFO are typically seen in younger patients (< age 40). TCD testing may be used to detect emboli for these patients, and thus might be indicated for younger patients who have experienced an unexplained stroke.

200.    Despite the extremely rare and limited circumstances in which TCD testing might be appropriate, Dr. Ahmed, performed it through Queens Medical, Northern Medical, and Pegasus Medical, and on behalf of other providers, on patients who show no indications of any of the conditions for which TCD testing might be appropriate.  Indeed, the majority of conditions for which TCD testing is appropriate are inherited conditions, such as sickle cell anemia or

stroke in younger patients with a PFO, or rare conditions, such as severe narrowing of an intracranial blood vessel that may require a neurosurgical bypass. None of these would result from an automobile accident. Vasospasm should not occur after a minor automobile accident and would be distinctly rare from a traumatic brain injury even after a serious life threatening automobile accident. Those patients would be critically ill, with massive intracranial bleeding who would receive TCD testing in an ICU.

201.    Dr. Ahmed's explanations for performing TCD testing are not credible. Queens Medical's reports state that TCD testing is performed "to rule out subarachnoid hemorrhage as patient complains of headaches after the accident." Ex. 27. Dr. Ahmed has testified that Queens Medical performed TCD testing on one patient because "the patient was in an accident, complaining of headaches. Was uncertain whether the patient hit their head in the accident. That's the reason why the transcranial Doppler was performed." But TCD testing is not appropriate simply to address a headache, and patients with subarachnoid hemorrhages requiring TCD testing would have significant intracranial bleeding and be in an ICU.

202.    Moreover, Dr. Ahmed's TCD testing nearly always includes all three studies, a "complete" study, a vasoreactivity study, and emboli detection. *See, e.g.*, Ex. 28. There is no indication that any patients had the particular and rare conditions for which one of these procedures would be necessary, much less all three studies, and even if they did such conditions would not have been the result of an automobile accident. Moreover, while it is unlikely that any one patient had a condition requiring these three studies, it is inconceivable that nearly every patient Dr. Ahmed subjected to TCD testing did.

203.    In many instances when TCD testing was purportedly performed, Dr. Ahmed reported results with abnormal findings consisting of reduced velocities of multiple major

intracranial blood vessels.  It is unlikely that so many of his patients experienced reduced blood flow, suggesting that the testing was either improperly performed or results were fabricated. Indeed, significant slowing of blood velocity on TCD is associated with severe heart failure (cardiogenic shock), or intracranial arteries that are so critically narrowed that blood can barely move past the areas of narrowing. In such situations, patients would be neurologically impaired with altered mental states and/or focal neurological deficits.  If the results were legitimate, they would identify patients with extremely unusual and serious conditions requiring immediate and significant medical intervention.  Yet, there is no indication that Dr. Ahmed or any other health care provider did anything with the results or altered patient care in any way.

2.    **Vestibular Testing**

204.    Vestibular complaints involve conditions in which patients have issues orienting their bodies in space.  Patients with vestibular complaints may have dizziness, vertigo or imbalance, and headaches.  A variety of organ systems can be responsible for such symptoms based on input from the eyes, ears, brain, and postural input from the limbs (*i.e.*, how a person senses one's body in space).  A majority of vestibular disorders can be readily diagnosed from a thorough clinical history and exam without the use of dedicated vestibular testing.  When indicated, prior to performing vestibular testing, a differential diagnosis should be made based on patient complaints elicited from a history and examination.  Vestibular testing rarely provides a diagnosis itself and also does not indicate a level of disability, but rather may provide insight into vestibular function.  In most instances, the evaluation, diagnosis, and treatment of such patients are based on clinical history, nature of the symptoms, and the context in which the episodes occur.  In a limited subset of patients with vestibular complaints, vestibular testing may be used to assist in confirming diagnoses or to attempt to identify the site of a suspected dysfunction. There are a number of different vestibular tests that can be performed to assess the specific

dysfunction responsible for a suspected vestibular condition. Vestibular testing is never appropriate to address general complaints of dizziness, vertigo, headaches, or to screen for posttraumatic vestibular pathology without a supportive clinical history and examination. Importantly, there are a number of factors that can impact test outcomes and test interpretation, including proper calibration of equipment, active patient participation, proper administration of the tests, and whether the patient has taken certain medications (such as sedatives) prior to testing.

205. Vestibular testing consists of a number of different tests of physiology and function, but it does not address the level of subjective disability. Vestibular testing include a subset of tests involving VNG testing, in which video recording infrared eyeglasses track and record eye movements as patients are subjected to different stimulation and positional changes. VNG tests can include tracking and recording of eye movement while (a) patients are directed to follow objects that jump from place to place to identify the presence of spontaneous nystagmus or other abnormal eye movements that may occur without fixation; (b) patients are directed to follow objects that move smoothly or large objects that move continuously to identify the presence of gaze-evoked nystagmus or other abnormal eye movements that may occur when patients are directed to look in a particular direction; (c) patients are directed to move their heads (positional testing); or (d) hot and cold air or water are put into patients' ear canals (caloric testing). Charges for basic vestibular evaluation can be submitted under CPT Code 92540 which should include (a) evaluations for spontaneous nystagmus; (b) evaluations for gaze-evoked nystagmus; and (c) positional testing. Charges for caloric testing can be submitted separately under CPT Code 92537.

206.    In addition to VNG and caloric testing, vestibular testing can include rotary chair testing and computerized dynamic posturography.  Rotary chair testing is another subset of vestibular testing in which eye movement is tracked through video recording infrared eyeglasses while patients are rotated at various accelerations in a secured chair.  It focuses on the inner ear, can assess whether the cause of dysfunction impacts both ears (bilateral) and can confirm the accuracy of VNG tests, as an abnormal rotary chair test would be consistent with abnormal VNG tests.  Rotary chair testing can be billed under CPT Code 92546 and requires an office with a rotary chair.  Active head rotation testing is similar to rotary chair testing, but involves important differences.  While rotary chair testing involves a passive patient rotated in a chair and is focused on evaluating inputs from the inner ear, active head rotation involves an immobile patient rotating the head and includes other inputs to nystagmus beyond the inner ear, implicating or potentially implicating systems other than the inner ear.  In other words, active head rotation does not isolate the vestibular system in the same way rotary chair testing does.  The American Medical Association has explicitly stated active head rotation should not be billed under CPT Code 92546.

207.    Computerized dynamic posturography is a balance test performed as a patient stands on a platform to evaluate postural control with changes in inputs such as closing eyes to restrict the contribution of visual input to balance.  Other input such as from proprioceptive abilities (postural control or perception of where the body is in space) can be manipulated by the examiner altering the surface (firm vs. foam) or tilting the platform to evaluate other contributing systems to balance, including the vestibular system and brain.  Computerized dynamic posturography is rarely used in legitimate clinical settings as there is little clinical value.  When

indicated, the appropriate billing code for computerized dynamic posturography is CPT Code 92548.

208.    Despite the specific circumstances in which vestibular testing would be appropriate, Dr. Ahmed performed medically unnecessary vestibular testing through Queens Medical, Northern Medical, and Pegasus Medical, and on behalf of other providers. The vestibular testing is performed without justification and, in most cases, without any vestibular complaints or findings from the clinical history or evaluation. While in a legitimate setting vestibular complaints can be diagnosed through an effective clinical exam, there is no indication that patients undergo appropriate exams involving thorough clinical histories and examinations, that a specific diagnosis is being considered that can only be confirmed by subsequent vestibular testing, or that alternatives to testing are ever considered. On those occasions when patients have some vestibular complaints, they are no more than generalized complaints of dizziness, vertigo, and headaches, which are not appropriate justification for the tests. Some examination reports recommend tests to "r/o" or "rule out" "balance disorders[,]" *see, e.g.*, Ex. 29, which vestibular testing alone cannot do. In some instances, Queens Medical's own examination reports fail to identify any vestibular complaints, and sometimes fail to even include vestibular testing in the treatment plan, yet testing is still performed. *See, e.g.*, Ex. 30.

209.    Based on these insufficient examinations and generalized complaints, vestibular tests are then improperly performed and billed. While reports are not clear, Dr. Ahmed appears to bill the same vestibular tests for most patients on each date of service consisting of: (a) basic vestibular testing, including VNG with (i) evaluations for spontaneous nystagmus, (ii) evaluations for gaze-evoked nystagmus and (iii) positional testing; (b) caloric testing; (c) rotary chair testing; and (d) computerized dynamic posturography. Yet, even if these patients needed

some targeted vestibular testing, which there is no indication they did, the whole battery is certainly not indicated. Vestibular testing should not be used to screen for any possible vestibular dysfunction, but rather should be conducted to confirm a previous, specific diagnosis and to attempt to identify the site of dysfunction. It is unlikely that any one patient required all of these vestibular tests and it is inconceivable that most patients who received this battery of vestibular testing did.

210. Furthermore, there is no indication that Dr. Ahmed or the entities that billed for rotary-chair testing had the equipment necessary to perform the test and bill for it under CPT Code 92546. Instead it is likely they are using active head rotation, which is not an appropriate substitute for use of this billing code. Reports of Queens Medical do not describe the performance of vestibular testing involving the use of a secured chair, which is necessary for rotary chair testing. If such equipment was not involved, and patients were only asked to adjust their heads, the testing would have consisted of positional testing that should have been included in charges for basic vestibular testing under CPT Code 92540, and not separately billed.

211. Incredibly, most patients subjected to vestibular testing also undergo TCD testing on the same day. It is unlikely that any one patient would suffer from the rare combination of conditions that would justify both vestibular testing and TCD testing and inconceivable that so many patients would.

212. The results of the vestibular testing are nearly always normal, further confirming that the tests were unnecessary.

**J. The State Farm Companies' Justifiable Reliance**

213. Defendants are obligated legally and ethically to act honestly and with integrity. Yet, Defendants have submitted or caused to be submitted bills and supporting documentation

falsely representing that services were performed and were medically necessary when, in fact, they were not.

214.    The State Farm Companies are under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The bills and supporting documentation Defendants submitted or caused to be submitted to the State Farm Companies in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause the State Farm Companies to justifiably rely on them.

215.    As a result, the State Farm Companies have incurred damages of more than $1.4 million based upon the fraudulent charges.

216.    Defendants have made material misrepresentations and have taken other affirmative acts to conceal their fraud from the State Farm Companies.  Each bill and its supporting documentation, when viewed in isolation, does not reveal its fraudulent nature.  Only when the bills and supporting documentation are viewed together as a whole do the patterns emerge revealing the fraudulent nature of all the bills and supporting documentation.

**K.    Defendants' Fraudulent Scheme Includes Filing Litigation on Claims the State Farm Companies Have Not Paid**

217.    Another key component of Defendants' fraudulent scheme is that when the State Farm Companies deny payment on the fraudulent claims submitted or caused to be submitted by Defendants or do not pay the claims in full, Defendants file state-court lawsuits and arbitrations on those unpaid or underpaid fraudulent claims in a further attempt to profit from their fraud.

218.    As of the filing of this Complaint, the EDX Providers and Shockwave Therapy Providers have filed at least 203 state-court lawsuits and 432 arbitrations on such claims.

## V.      CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Regarding the EDX Enterprise Against ENS Medical, Atlantic Medical, Northern Medical, Queens Medical, Terrace Medical, Dr. Ahmed, Dr. Chi, and Dr. St. Hill)

219.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein each and every allegation in Paragraphs 1 through 218 above.

220.    ENS Medical, Atlantic Medical, Northern Medical, Queens Medical, Terrace Medical, Dr. Ahmed, Dr. Chi, and Dr. St. Hill (collectively, the "EDX Enterprise Defendants") constitute an association-in-fact "enterprise" (the "EDX Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.  The members of the EDX Enterprise are and have been joined in a common purpose, namely to defraud State Farm Mutual, State Farm Fire, and other insurers by submitting or causing to be submitted bills and supporting documentation that are fraudulent for examinations and EDX Tests that were not medically necessary and/or were not legitimately reimbursable.  Although different members of the enterprise perform different roles, together they have operated as a continuing unit with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose — to defraud State Farm Mutual, State Farm Fire, and other insurers through insurance claims — with sufficient longevity to accomplish that common purpose.

221.    Specifically, the EDX Providers — ENS Medical, Atlantic Medical, Northern Medical, Queens Medical, and Terrace Medical — were referred patients based on financial arrangements that included the payment of kickbacks between Dr. Ahmed, the EDX Providers, and the Referring Providers — Metro Pain, Dr. Shapiro, Smart Choice Medical, Dr. Chumaceiro, Dr. Barakat, and others — and/or individuals in charge of the Clinics where the EDX Providers

99

performed neurological examinations and EDX Tests. Rendering EDX Providers Dr. Ahmed, Dr. Chi, Dr. St. Hill, and others, and the EDX Providers provided neurological examinations and EDX Tests to patients, and then Dr. Ahmed and the EDX Providers submitted or caused to be submitted to State Farm Mutual and State Farm Fire fraudulent bills and supporting documentation, including referrals signed by the Referring Providers.

222.    The roles and participation of each of these EDX Enterprise Defendants in the scheme was necessary to the success of the scheme. No one member of the EDX Enterprise was capable of carrying out the scheme without the participation of the other members in the EDX Enterprise. Members of the EDX Enterprise have acted with sufficient longevity to achieve their common goal of defrauding State Farm Mutual and State Farm Fire through the submission of fraudulent insurance claims.

223.    Each EDX Enterprise Defendant is or has been employed by and/or associated with the EDX Enterprise.

224.    Each EDX Enterprise Defendant has knowingly conducted and/or participated, directly or indirectly, in the conduct of the EDX Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of United States mails to submit or cause to submit to State Farm Mutual, State Farm Fire, and other insurers bills and supporting documentation that are fraudulent in that the neurological examinations and EDX Tests provided by the EDX Providers and Rendering EDX Providers Dr. Ahmed, Dr. Chi, and Dr. St. Hill, including those referenced in Exhibit 1, were not medically necessary and not reimbursable.

225.    State Farm Mutual and State Farm Fire have been injured in their business and property by reason of the above-described conduct in that they have paid more than $1,040,000 based upon the fraudulent charges and submissions.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against ENS Medical, Atlantic Medical, Northern Medical, Queens Medical, Terrace Medical, Dr. Ahmed, Dr. Chi, and Dr. St. Hill for compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, and any other relief that the Court deems just and proper.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Against ENS Medical, Atlantic Medical, Northern Medical, Queens Medical, Terrace Medical, Dr. Ahmed, Dr. Chi, and Dr. St. Hill)

226.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein each and every allegation in Paragraphs 1 through 218 above, and Paragraphs 219 through 225.

227.    ENS Medical, Atlantic Medical, Northern Medical, Queens Medical, Terrace Medical, Dr. Ahmed, Dr. Chi, and Dr. St. Hill have knowingly agreed and conspired to conduct and/or participate, directly or indirectly, in the conduct of the EDX Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit or cause to submit fraudulent bills and supporting documentation to State Farm Mutual, State Farm Fire, and other insurers for examinations and EDX Tests provided by ENS Medical, Atlantic Medical, Northern Medical, Terrace Medical, and Rendering EDX Providers Dr. Ahmed, Dr. Chi, and Dr. St. Hill, including those referenced in Exhibit 1, which were not medically necessary and not reimbursable.

228. Each EDX Enterprise Defendant knew of, agreed to, and acted in furtherance of the common and overall objective of the conspiracy by facilitating the submission of bills and supporting documentation that are fraudulent for the examinations and EDX Tests to State Farm Mutual, State Farm Fire, and other insurers, which were not medically necessary and not reimbursable.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against ENS Medical, Atlantic Medical, Northern Medical, Terrace Medical, Dr. Ahmed, Dr. Chi, and Dr. St. Hill for compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, and any other relief that the Court deems just and proper.

### THIRD CLAIM FOR RELIEF
### COMMON LAW FRAUD
**(Against ENS Medical, Atlantic Medical, Northern Medical, Queens Medical, Terrace Medical, Dr. Ahmed, Dr. Chi, and Dr. St. Hill)**

229. State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege, as though fully set forth herein, each and every allegation in Paragraphs 1 through 218 above.

230. The EDX Enterprise Defendants — ENS Medical, Atlantic Medical, Northern Medical, Queens Medical, Terrace Medical, Dr. Ahmed, Dr. Chi, and Dr. St. Hill — conspired, agreed to, and did act in concert pursuant to a common purpose or plan by intentionally and knowingly making false and fraudulent statements of material fact to State Farm Mutual and State Farm Fire by submitting, and causing to be submitted, bills and supporting documentation that contained false representations of material fact and were not reimbursable concerning patients treated by the EDX Providers and Rendering EDX Providers Dr. Ahmed, Dr. Chi, and Dr. St. Hill.

231.     The false statements of material fact include the representations in each and every claim described in the chart attached hereto as Exhibit 1 that: (a) patients were legitimately examined and tested to determine the true nature and extent of their injuries, when they were not; (b) each patient's condition was related to an automobile accident and no other contributing factors, when the EDX Enterprise Defendants did not legitimately reach such conclusions; (c) the services and tests were performed and were medically necessary when, in fact, they either were not performed or were not medically necessary; and (d) the services and tests were reimbursable when, in fact, they were not including because they were the result of unlawful kickbacks and "pay to play" arrangements, including but not limited to, all bills and supporting documentation submitted to State Farm Mutual or State Farm Fire for claims referenced in Exhibit 1.

232.     The EDX Enterprise Defendants knew the above-described misrepresentations made to State Farm Mutual and State Farm Fire relating to the purported examinations, testing, and diagnoses were false and fraudulent and were not reimbursable when they were made.

233.     The EDX Enterprise Defendants made the above-described misrepresentations and engaged in such conduct to induce State Farm Mutual and State Farm Fire into relying on the misrepresentations.

234.     As a result of their justifiable reliance on the EDX Enterprise Defendants' misrepresentations, State Farm Mutual and State Farm Fire have incurred damages of more than $1,040,000.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against ENS Medical, Atlantic Medical, Northern Medical, Queens Medical, Terrace Medical, Dr. Ahmed, Dr. Chi, and Dr. St. Hill for compensatory damages, punitive damages, costs, and other such relief as this Court deems equitable, just, and proper.

**FOURTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**
**(Against ENS Medical, Atlantic Medical, Northern Medical, Queens Medical, Terrace Medical, Dr. Ahmed, Dr. Chi, and Dr. St. Hill)**

235.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege, as though fully set forth herein, each and every allegation in Paragraphs 1 through 218 above.

236.    State Farm Mutual and State Farm Fire conferred a benefit upon ENS Medical, Atlantic Medical, Northern Medical, Queens Medical, Terrace Medical, Dr. Ahmed, Dr. Chi, and Dr. St. Hill by paying claims for services purportedly provided to patients who received examinations and EDX Tests, and these defendants voluntarily accepted and retained the benefit of those payments.

237.    Because ENS Medical, Atlantic Medical, Queens Medical, Northern Medical, Terrace Medical, Dr. Ahmed, Dr. Chi, and Dr. St. Hill knowingly billed for services that were not medically necessary, were not rendered, and were not reimbursable, and/or caused such bills and supporting documentation to be submitted, the circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

238.    As a direct and proximate result of the above-described conduct of ENS Medical, Atlantic Medical, Northern Medical, Queens Medical, Terrace Medical, Dr. Ahmed, Dr. Chi, and Dr. St. Hill, State Farm Mutual and State Farm Fire have been damaged and the Defendants have been enriched by more than $1,040,000.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against ENS Medical, Atlantic Medical, Northern Medical, Queens Medical, Terrace Medical, Dr. Ahmed, Dr. Chi, and Dr. St. Hill for compensatory damages plus interest and costs and for such other relief as the Court deems equitable, just, and proper.

## FIFTH CLAIM FOR RELIEF
## AIDING AND ABETTING FRAUD
### (Against ENS Medical, Atlantic Medical, Northern Medical, Queens Medical, Terrace Medical, Dr. Ahmed, Dr. Chi, and Dr. St. Hill)

239.     State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege, as though fully set forth herein, each and every allegation in Paragraphs 1 through 218 above.

240.     ENS Medical, Atlantic Medical, Northern Medical, Queens Medical, Terrace Medical, Dr. Ahmed, Dr. Chi, and Dr. St. Hill conspired, agreed to, and did act in concert to defraud State Farm Mutual and State Farm Fire by submitting, and causing to be submitted, bills and supporting documentation that contained false representations of material fact and were not reimbursable concerning examinations and EDX Tests.

241.     The false statements of material fact include the representations in each and every claim set forth in the chart attached hereto as Exhibit 1 that:  (a) patients were legitimately examined and tested to determine the true nature and extent of their injuries, when they were not; (b) each patient's condition was related to an automobile accident and no other contributing factors, when these Defendants did not legitimately reach such conclusions; (c) the services and tests were performed and were medically necessary when, in fact, they either were not performed or were not medically necessary; and (d) the services and tests were reimbursable when, in fact, they were not including because they were the result of unlawful kickbacks and "pay to play" arrangements, including but not limited to, all bills and supporting documentation submitted to State Farm Mutual or State Farm Fire for claims referenced in Exhibit 1.

242.     ENS Medical, Atlantic Medical, Northern Medical, Queens Medical, Terrace Medical, Dr. Ahmed, Dr. Chi, and Dr. St. Hill knew that the above-described misrepresentations made to State Farm Mutual and State Farm Fire relating to the purported examinations, testing, and diagnoses of patients were false and fraudulent and were not reimbursable at the time they

were made.  ENS Medical, Atlantic Medical, Northern Medical, Queens Medical, Terrace Medical, Dr. Ahmed, Dr. Chi, and Dr. St. Hill made the above-described misrepresentations and engaged in such conduct to induce State Farm Mutual and State Farm Fire into relying on the misrepresentations, and State Farm Mutual and State Farm Fire did, in fact, rely upon such misrepresentations.

243.   ENS Medical, Atlantic Medical, Northern Medical, Queens Medical, Terrace Medical, Dr. Ahmed, Dr. Chi, and Dr. St. Hill each substantially assisted in defrauding State Farm Mutual and State Farm Fire.  Dr. Ahmed, Dr. Chi, and Dr. St. Hill affirmatively assisted in the scheme by purporting to perform medically unnecessary neurological examinations and EDX Tests and preparing reports that purported to summarize the examination findings and EDX Test results.  ENS Medical, Atlantic Medical, Northern Medical, Queens Medical, Terrace Medical, and their owner, Dr. Ahmed, affirmatively assisted in the scheme by preparing and submitting, or causing to be prepared or submitted, fraudulent bills and supporting documentation regarding the medically unnecessary neurological examinations and EDX Tests to State Farm Mutual and State Farm Fire.

244.   As a direct and proximate result of ENS Medical, Atlantic Medical, Northern Medical, Queens Medical, Terrace Medical, Dr. Ahmed, Dr. Chi, and Dr. St. Hill's fraud, which was aided and abetted by each such defendant, State Farm Mutual and State Farm Fire justifiably relied on ENS Medical, Atlantic Medical, Northern Medical, Queens Medical, Terrace Medical, Dr. Ahmed, Dr. Chi, and Dr. St. Hill's fraudulent misrepresentations and have incurred damages of more than $1,040,000.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against ENS Medical, Atlantic Medical, Northern Medical, Queens Medical, Terrace Medical, Dr. Ahmed,

Dr. Chi, and Dr. St. Hill for compensatory damages plus interest and costs and for such other relief as the Court deems equitable, just, and proper.

## SIXTH CLAIM FOR RELIEF
### VIOLATION OF 18 U.S.C. § 1962(c)
#### (Regarding the Shockwave Therapy Enterprise Against East Coast Medical, Garden Medical, Town Medical, Go Medical, Dr. Ahmed, and Dr. Gelb)

245.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege, as though fully set forth herein, each and every allegation in Paragraphs 1 through 218 above.

246.    East Coast Medical, Garden Medical, Town Medical, Go Medical, Dr. Ahmed, and Dr. Gelb (collectively, the "Shockwave Enterprise Defendants") constitute an association-in-fact "enterprise" (the "Shockwave Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.  The members of the Shockwave Enterprise are and have been joined in a common purpose, namely to defraud State Farm Mutual, State Farm Fire, and other insurers by submitting or causing to be submitted bills and supporting documentation that are fraudulent for examinations and Shockwave Therapy that were not medically necessary and/or were not legitimately reimbursable.  Although different members of the enterprise perform different roles, together they have operated as a continuing unit with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose — to defraud State Farm Mutual, State Farm Fire, and other insurers through insurance claims — with sufficient longevity to accomplish that common purpose.

247.    Specifically, the Shockwave Enterprise Defendants entered into arrangements to obtain access to patients on whom Shockwave Therapy could be performed with providers and others who controlled locations where patients were treatment, sometimes characterized as leases in which East Coast Medical, Town Medical, Garden Medical, and Go Medical pay rent for the purported "use" of space.  In fact, referrals and access to patients were the result of these

financial arrangements that included the payment of kickbacks. The Rendering Shockwave Therapy Providers — Dr. Ahmed, Dr. Gelb, Richard Fofie, P.A., and others — and East Coast Medical, Garden Medical, Go Medical, and Town Medical provided examinations and Shockwave Therapy to patients, and then Dr. Ahmed, East Coast Medical, Garden Medical, Go Medical, and Town Medical submitted or caused to be submitted to State Farm Mutual and State Farm Fire fraudulent bills and supporting documentation, including referrals signed by the referring providers.

248. The roles and participation of each of these Shockwave Enterprise Defendants in the scheme was necessary to the success of the scheme. No one member of the Shockwave Enterprise was capable of carrying out the scheme without the participation of the other members in the Shockwave Enterprise. Members of the Shockwave Enterprise have acted with sufficient longevity to achieve their common goal of defrauding State Farm Mutual and State Farm Fire through the submission of fraudulent insurance claims.

249. Each Shockwave Enterprise Defendant is or has been employed by and/or associated with the Shockwave Enterprise.

250. Each Shockwave Enterprise Defendant has knowingly conducted and/or participated, directly or indirectly, in the conduct of the Shockwave Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of United States mails to submit or cause to submit to State Farm Mutual, State Farm Fire, and other insurers bills and supporting documentation that are fraudulent in that examinations and Shockwave Therapy provided by East Coast Medical, Garden Medical, Go Medical, and Town Medical and the Rendering Shockwave Therapy

Providers, including those referenced in Exhibit 2, were not medically necessary and not reimbursable.

251.   State Farm Mutual and State Farm Fire have been injured in their business and property by reason of the above-described conduct in that they have paid more than $290,000 based upon the fraudulent charges and submissions.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against East Coast Medical, Garden Medical, Go Medical, Town Medical, Dr. Ahmed, and Dr. Gelb for compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, and any other relief that the Court deems just and proper.

**SEVENTH CLAIM FOR RELIEF**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Against East Coast Medical, Garden Medical, Town Medical, Go Medical, Dr. Ahmed, and Dr. Gelb)**

252.   State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege, as though fully set forth herein, each and every allegation in Paragraphs 1 through 218 and Paragraphs 245 through 251 above.

253.   East Coast Medical, Garden Medical, Town Medical, Go Medical, Dr. Ahmed, and Dr. Gelb have knowingly agreed and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Shockwave Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit or cause to submit fraudulent bills and supporting documentation to State Farm Mutual, State Farm Fire, and other insurers for examinations and Shockwave Therapy provided by East Coast Medical, Garden Medical, Town

Medical, Go Medical, and the Rendering Shockwave Therapy Providers, including those referenced in Exhibit 2, which were not medically necessary and not reimbursable.

254.    Each Shockwave Enterprise Defendant knew of, agreed to, and acted in furtherance of the common and overall objective of the conspiracy by facilitating the submission of bills and supporting documentation that are fraudulent for the examinations and Shockwave Therapy to State Farm Mutual, State Farm Fire, and other insurers, which were not medically necessary and not reimbursable.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against East Coast Medical, Garden Medical, Town Medical, Go Medical, Dr. Ahmed, and Dr. Gelb for compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, and any other relief that the Court deems just and proper.

**EIGHTH CLAIM FOR RELIEF**
**COMMON LAW FRAUD**
**(Against East Coast Medical, Garden Medical, Town Medical, Go Medical, Dr. Ahmed, and Dr. Gelb)**

255.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege, as though fully set forth herein, each and every allegation in Paragraphs 1 through 218 above.

256.    East Coast Medical, Garden Medical, Town Medical, Go Medical, Dr. Ahmed, and Dr. Gelb (the "Shockwave Defendants") conspired, agreed to, and did act in concert pursuant to a common purpose or plan by intentionally and knowingly making false and fraudulent statements of material fact to State Farm Mutual and State Farm Fire by submitting or causing to be submitted, bills and supporting documentation that contained false representations of material fact and were not reimbursable concerning patients treated by the Shockwave Therapy Providers and the Rendering Shockwave Therapy Providers.

257.    The false statements of material fact include representations in each and every claim described in the chart attached hereto as Exhibit 2 that: (a) patients were legitimately examined and tested to determine the true nature and extent of their injuries, when they were not; (b) each patient's condition was related to an automobile accident and no other contributing factors, when the Shockwave Defendants did not legitimately reach such conclusions; (c) the examinations and Shockwave Therapy were performed and were medically necessary when, in fact, they either were not performed or were not medically necessary; and (d) the examinations and Shockwave Therapy were reimbursable when, in fact, they were not including because they were the result of unlawful kickbacks and "pay to play" arrangements, including but not limited to, all bills and supporting documentation submitted to State Farm Mutual and State Farm Fire for claims referenced in Exhibit 2.

258.    The Shockwave Defendants knew of the above-described misrepresentations made to State Farm Mutual and State Farm Fire relating to the purported examinations and Shockwave Therapy, and diagnoses were false and fraudulent and were not reimbursable when they were made.

259.    The Shockwave Defendants made the above-described misrepresentations and engaged in such conduct to induce State Farm Mutual and State Farm Fire into relying on the misrepresentations.

260.    As a result of their justifiable reliance on the Shockwave Defendants' misrepresentations, State Farm Mutual and State Farm Fire have incurred damages of at least $290,000.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against East Coast Medical, Garden Medical, Town Medical, Go Medical, Dr. Ahmed, and Dr. Gelb for

compensatory damages, punitive damages, costs, and other such relief as this Court deems equitable, just, and proper.

**NINTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**
**(Against East Coast Medical, Garden Medical, Town Medical, Go Medical, Dr. Ahmed, and Dr. Gelb)**

261.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege, as though fully set forth herein, each and every allegation in Paragraphs 1 through 218 above.

262.    State Farm Mutual and State Farm Fire conferred a benefit upon East Coast Medical, Garden Medical, Town Medical, Go Medical, Dr. Ahmed, and Dr. Gelb (the "Shockwave Defendants") by paying claims for services purportedly provided to patients who received examinations and Shockwave Therapy, and the Shockwave Defendants voluntarily accepted and retained the benefit of those payments.

263.    Because the Shockwave Defendants knowingly billed for services that were not medically necessary, were not rendered, and were not reimbursable, and/or caused such bills and supporting documentation to be submitted, the circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

264.    As a direct and proximate result of the above-described conduct of the Shockwave Defendants, State Farm Mutual and State Farm Fire have been damaged and these Defendants have been enriched by at least $290,000.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against East Coast Medical, Garden Medical, Town Medical, Go Medical, Dr. Ahmed, and Dr. Gelb for compensatory damages plus interest and costs and for such other relief as the Court deems equitable, just, and proper.

### TENTH CLAIM FOR RELIEF
### AIDING AND ABETTING FRAUD
### (Against East Coast Medical, Garden Medical, Town Medical, Go Medical, Dr. Ahmed, and Dr. Gelb)

265.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege, as though fully set forth herein, each and every allegation in Paragraphs 1 through 218 above.

266.    East Coast Medical, Garden Medical, Town Medical, Go Medical, Dr. Ahmed, and Dr. Gelb (the "Shockwave Defendants") conspired, agreed to, and did act in concert to defraud State Farm Mutual and State Farm Fire by submitting, and causing to be submitted, bills and supporting documentation that contained false representations of material fact and were not reimbursable concerning examinations and Shockwave Therapy.

267.    The false statements of material fact include the representations in each and every claim set forth in the chart attached hereto as Exhibit 2 that: (a) patients were legitimately examined and tested to determine the true nature and extent of their injuries, when they were not; (b) each patient's condition was related to an automobile accident and no other contributing factors, when the Shockwave Defendants did not legitimately reach such conclusions; (c) the examinations and Shockwave Therapy were performed and were medically necessary when, in fact, they either were not performed or were not medically necessary; and (d) the services and tests were reimbursable when, in fact, they were not including because they were the result of unlawful kickbacks and "pay to play" arrangements, including but not limited to, all bills and supporting documentation submitted to State Farm Mutual and State Farm Fire for claims referenced in Exhibit 2.

268.    The Shockwave Defendants knew that the above-described misrepresentations made to State Farm Mutual and State Farm Fire relating to the purported examinations, Shockwave Therapy, and diagnoses of patients were false and fraudulent and were not

reimbursable at the time they were made. The Shockwave Defendants made the above-described misrepresentations and engaged in such conduct to induce State Farm Mutual and State Farm Fire into relying on the misrepresentations, and State Farm Mutual and State Farm Fire did, in fact, rely upon such misrepresentations.

269.    Each Shockwave Defendant substantially assisted in defrauding State Farm Mutual and State Farm Fire. The Rendering Shockwave Therapy Providers affirmatively assisted in the scheme by purporting to perform medically unnecessary examinations and Shockwave therapy and preparing reports that purported to summarize the examination findings and Shockwave Therapy performed on patients. East Coast Medical, Garden Medical, Town Medical, Go Medical, and their owner, Dr. Ahmed, affirmatively assisted in the scheme by preparing and submitting, or causing to be prepared or submitted, fraudulent bills and supporting documentation regarding the medically unnecessary examinations and Shockwave Therapy to State Farm Mutual and State Farm Fire.

270.    As a direct and proximate result of the Defendants' fraud, which was aided and abetted by each of the Shockwave Defendants, State Farm Mutual and State Farm Fire justifiably relied on the Shockwave Defendants' fraudulent misrepresentations and have incurred damages of at least $290,000.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against East Coast Medical, Garden Medical, Town Medical, Go Medical, Dr. Ahmed, and Dr. Gelb for compensatory damages plus interest and costs and for such other relief as the Court deems equitable, just, and proper.

## ELEVENTH CLAIM FOR RELIEF
## DECLARATORY JUDGMENT
**(Against ENS Medical, Atlantic Medical, Northern Medical, Queens Medical, and Terrace Medical)**

271.   State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege, as though fully set forth herein, each and every allegation in Paragraphs 1 through 218 above.

272.   This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

273.   There is an actual case and controversy between State Farm Mutual and State Farm Fire, on the one hand, and ENS Medical, Atlantic Medical, Northern Medical, Queens Medical, and Terrace Medical on the other hand, as to all charges for neurological examinations and EDX Tests that have not been paid to date or otherwise resolved, as well as any additional charges submitted through the pendency of this litigation.  State Farm Mutual and State Farm Fire contend ENS Medical, Atlantic Medical, Northern Medical, Queens Medical, and Terrace Medical are not entitled to reimbursement for any of these charges.

274.   Because ENS Medical, Atlantic Medical, Northern Medical, Queens Medical, and Terrace Medical have made false and fraudulent statements, otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each such claim, and otherwise submitted claims that are not entitled to reimbursement, they are not entitled to any coverage for No-Fault Benefits for any of these claims.

WHEREFORE, State Farm Mutual and State Farm Fire respectfully request a judgment declaring that ENS Medical, Atlantic Medical, Northern Medical, Queens Medical, and Terrace Medical are not entitled to collect No-Fault Benefits for any unpaid charges for neurological examinations and EDX Tests to date and through the pendency of this litigation, and for

supplementary relief, attorneys' fees, interest, and costs as this Court deems equitable, just, and proper.

**TWELFTH CLAIM FOR RELIEF**
**DECLARATORY JUDGMENT**
**(Against East Coast Medical, Garden Medical, Go Medical, and Town Medical)**

275.     State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege, as though fully set forth herein, each and every allegation in Paragraphs 1 through 218 above.

276.     This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

277.     There is an actual case and controversy between State Farm Mutual and State Farm Fire, on the one hand, and East Coast Medical, Garden Medical, Go Medical, and Town Medical on the other hand, as to all charges for examinations and Shockwave Therapy that have not been paid to date or otherwise resolved, as well as any additional charges submitted through the pendency of this litigation.  State Farm Mutual and State Farm Fire contend East Coast Medical, Garden Medical, Go Medical, and Town Medical are not entitled to reimbursement for any of these charges.

278.     Because East Coast Medical, Garden Medical, Go Medical, and Town Medical have made false and fraudulent statements, otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each such claim, and otherwise submitted claims that are not entitled to reimbursement, they are not entitled to any coverage for No-Fault Benefits for any of these claims.

WHEREFORE, State Farm Mutual and State Farm Fire respectfully request a judgment declaring that East Coast Medical, Garden Medical, Go Medical, and Town Medical are not entitled to collect No-Fault Benefits for any unpaid charges for examinations and Shockwave Therapy to date and through the pendency of this litigation, and for supplementary relief, attorneys' fees, interest, and costs as this Court deems equitable, just, and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm Mutual and State Farm

Fire demand a trial by jury.

Dated:  September 19, 2023                           Respectfully submitted,
        New York, New York

                                                 KATTEN MUCHIN ROSENMAN LLP

                                            By: */s/ Jonathan L. Marks*
                                                Ross O. Silverman (NY Bar No. 4147922)
                                                Jonathan L. Marks (NY Bar No. 5462874)
                                                Matthew R. Ryan (motion for *pro hac vice*
                                                to be filed)
                                                KATTEN MUCHIN ROSENMAN LLP
                                                525 West Monroe Street
                                                Chicago, Illinois 60661
                                                Telephone:  312.902.5200
                                                Facsimile:  312.902.1061
                                                ross.silverman@katten.com
                                                jonathan.marks@katten.com
                                                matthew.ryan@katten.com

                                                *Attorneys for Plaintiffs State Farm Mutual*
                                                *Automobile Insurance Company and State*
                                                *Farm Fire & Casualty Company*